**SCHLAIFER NANCE & COMPANY, INC., Plaintiff,**

**v.**

**The ESTATE OF Andy WARHOL, Frederick Hughes, and Edward W. Hayes, Esq., Defendants.**

**No. 90 Civ. 1095 (DC).**

United States District Court, S.D. New York.

May 15, 1996.

Powell, Goldstein, Frazer & Murphy by James C. Rawls, Scott Greene, Kathlynn L. Butler, Atlanta, Georgia, and Paul K. Rooney, New York City, for Plaintiff Schlaifer Nance & Company, Inc.

Coblence & Warner by Paul J. Hanly, Jr., New York City, for Defendants The Estate of Andy Warhol and Edward W. Hayes, Esq.

Winthrop, Stimson, Putnam & Roberts by Susan J. Kohlmann, New York City, for Defendants The Estate of Andy Warhol and Frederick Hughes.

## *OPINION*

CHIN, District Judge.

On June 27, 1995, following a seven-day trial, the jury in this case returned a verdict in favor of plaintiff Schlaifer Nance & Company, Inc. ("SNC") against defendants The Estate of Andy Warhol (the "Estate"), Frederick Hughes ("Hughes"), and Edward W. Hayes, Esq. ("Hayes"). The jury found that all three defendants had fraudulently induced SNC to enter into a licensing agreement with the Estate. The jury awarded punitive damages against the three defendants in the amount of $1 million each. Pursuant to testimony presented by SNC, not contested by defendants, the amount of compensatory

damages to be awarded on the basis of the jury's finding of fraud—if that finding were to be sustained—would be $63,941. (Tr. 274–77, 342, 1026–30).[1]

Before the Court is defendants' motion pursuant to Fed.R.Civ.P. 50(b) for judgment as a matter of law. The motion is granted, for the jury could not have reasonably found that SNC proved its claim of fraud by clear and convincing evidence or that defendants acted with the moral culpability necessary to warrant an award of punitive damages.

In essence, SNC alleged that defendants fraudulently represented that the Estate controlled all the rights to all of Warhol's works, when defendants knew that many of Warhol's works had fallen into the public domain and that Warhol had also entered into agreements giving rights to others. As the incontrovertible evidence showed, however, SNC knew or should have known that the representations that the Estate controlled all the rights to all of Warhol's works could not have been true. Yet, SNC entered into the licensing agreement without conducting any due diligence and without making any reasonable effort to determine the truth or falsity of the purported representations. SNC could not have reasonably relied on representations that it knew or should have known were false but did not even bother to investigate. Hence, the jury could not have found by clear and convincing evidence that SNC's reliance on defendants' purported misrepresentations was reasonable and justifiable.

Second, even assuming that the jury could have properly found that SNC had proven fraud by clear and convincing evidence, it could not have reasonably found that defendants acted with the evil motive or high degree of moral culpability required for an award of punitive damages. Defendants had nothing to gain by defrauding SNC. The agreement provided for no "upfront" money to be paid to defendants for the right to exploit Warhol's works; rather, the Estate was to be paid solely from royalties, and no minimum was guaranteed by SNC until the third year of the agreement. In addition, SNC had the right to terminate the agreement in the event of a material breach and it

could have done so before the minimum royalties provisions became effective. Hence, defendants would have profited from their purported scheme only if SNC successfully exploited the rights. Finally, it is undisputed that defendants made certain disclosures that were wholly inconsistent with any malice or evil intent.

The jury's finding of fraud and its award of a total of $3 million in punitive damages could only have been the product of sheer surmise and speculation. Accordingly, the motion for judgment as a matter of law is granted and judgment will be entered in favor of defendants dismissing the third amended complaint.

### BACKGROUND

#### A. The Parties

##### 1. Plaintiff

Plaintiff SNC is a licensing and product development company operating out of Atlanta, Georgia. It has been in the business of developing and marketing ideas and products for approximately 20 years. Its most successful venture was the Cabbage Patch Kids program, which resulted in the licensing of the "concept" of Cabbage Patch dolls for a wide variety of children's merchandise, including clothing, toys, bicycles, and play houses. (Tr. 231–35). SNC was established by Roger L. Schlaifer and Susanne Nance Schlaifer, who, in addition to being husband and wife, are the President and Executive Vice President of SNC, respectively. (Tr. 230–31, 468).

##### 2. Defendants

Andy Warhol died on February 22, 1987. He was described in an obituary as "a founder of Pop Art whose paintings and prints of Presidents, movie stars, soup cans and other icons of America made him one of the most famous artists in the world." Douglas C. McGill, *Andy Warhol, Pop Artist, Dies,* N.Y. Times, Feb. 23, 1987, at A1. He was a prolific artist who created "tens and tens of thousands of artworks" over his 40–year ca-

---

1. References to "Tr." are to the trial transcript.

reer. (Tr. 109; *see also* Tr. 948 (referring to "sheer magnitude" of Warhol's works)).

Hughes, who had been Warhol's business manager for many years, was named executor of Warhol's will. He hired Hayes to be general counsel of the Estate. (Tr. 40, 686). Both Hughes and Hayes expected to be compensated for their services. They were obliged to maximize the assets of the Estate, and it was in their financial interest to do so, for their compensation was based, at least in part, on the value of the Estate. (Tr. 40–42).

Hayes, in turn, hired Francis J. Harvey, Jr., Esq., for the latter's expertise in estate law. Hayes agreed that Harvey would receive as compensation for his services one-fourth of the fees that Hayes received. (Tr. 42–43). In the end, the Surrogate's Court awarded Hayes $7.2 million in fees, which was to be shared with Harvey. (Tr. 123).[2]

### B. *The Facts*

#### 1. *SNC's Interest in a Warhol Program*

In August 1985, in connection with its work on the Cabbage Patch Kids program, SNC commissioned Andy Warhol to do portraits of four Cabbage Patch dolls. (Tr. 236–37). When Roger Schlaifer was at Warhol's studio in New York (which was referred to as "The Studio" or "The Factory") to discuss the paintings, he developed the idea of "building a fashion program around Andy Warhol," capitalizing on "Andy Warhol's name, his association with glamorous people, [his] incredible compositions." (Tr. 237–38). In October of 1985, Schlaifer spoke first to Warhol and then to Hughes about a licensing program. (Tr. 238–39).

Negotiations ensued and meetings were held to discuss a licensing program involving SNC and Andy Warhol. During these discussions, Schlaifer emphasized that SNC was only interested in an "exclusive agreement" because it did not want to be competing with other licensing companies. (Tr. 238–41). The discussions led to the drafting of a proposed licensing agreement by SNC's lawyers, Powell, Goldstein, Frazer & Murphy, a large Atlanta law firm, in the summer of 1986. (Tr. 278–81). In September of 1986, however, the negotiations were suspended indefinitely, at Warhol's request (as communicated to Schlaifer by Hughes). (Tr. 284). Schlaifer described this turn of events as "very disappointing." (Tr. 285).

Notwithstanding the suspension of negotiations, Schlaifer continued to have occasional discussions with Hughes about a licensing program and the possibility of a reduced program. (Tr. 286–88). There were no major developments, however, until after Warhol's death on February 22, 1987.

#### 2. *The Negotiations with the Estate*

In March 1987, just a few weeks after Warhol's death, Schlaifer met with Hughes to discuss a licensing program with the Estate. (Tr. 289–90). Schlaifer "enthusiastically" suggested that a "worthwhile" program could still be done. (Tr. 289–90). Further discussions between Schlaifer and Hughes followed, and eventually Schlaifer also met and had discussions with Hayes in his capacity as general counsel of the Estate. (Tr. 290–305).

In March or April of 1987, Hughes and Schlaifer had dinner in New York. Hughes asked Schlaifer if he would have "any problem" if a friend of Andy Warhol's "did" a limited edition art watch using Warhol's photographs. Schlaifer responded that he did not see a problem with such a limited edition as long as it did not interfere with SNC's ability to do a watch program. (Tr. 311–12).

On May 18, 1987, Schlaifer met with Hayes and Hughes in Manhattan for lunch, after which they continued their discussions at The Factory. (Tr. 290–92). Schlaifer raised the

---

**2.** The Surrogate Court's decision on the fee application is reported in *In re Estate of Warhol*, 165 Misc.2d 726, 629 N.Y.S.2d 621 (N.Y.Co. Surr.Ct.1995). On appeal, the fee was reduced by the Appellate Division, First Department, from $7.2 million to $3.5 million. *In re Estate of Warhol*, —— A.D.2d ——, 637 N.Y.S.2d 708 (1st Dep't 1996). The Appellate Division's decision was issued on February 8, 1996, many months after the jury had rendered its decision in this case on the basis of evidence that Hayes had been awarded $7.2 million in fees. The New York State Court of Appeals affirmed the Appellate Division's ruling. *See* N.Y.L.J., May 9, 1996, at 1.

issue of "knock-offs" (Tr. 291), to which Hayes responded at one point: "No one is going to get away with using Andy Warhol for free." (Tr. 296). At another point, in the course of discussing SNC's proposed ⁶⁵⁄₃₅% "split" of royalties, Hughes said, "[W]e own all of these rights [to Andy Warhol's art]. We control all of these rights, so we think it is more fair if it is just an even split." (Tr. 296). Neither Hayes nor Hughes revealed that any of Warhol's works had fallen into the public domain. (Tr. 296–99). Nor did Hayes say anything when Hughes said, "We control all the rights." (Tr. 299).

The negotiations continued into the summer of 1987. Schlaifer discussed with Hayes on more than one occasion SNC's need "to have the exclusive rights." (Tr. 304). In none of these discussions did Hayes disclose that any of Warhol's works had or might have fallen into the public domain. (Tr. 228, 305). Nor did Hughes tell Schlaifer, at any time prior to the signing of the license agreement, that any copyrights had fallen into the public domain. (Tr. 228). As Schlaifer explained at trial, once a work had fallen into the public domain, the copyright was lost and "every person in the world" was free to use the work. (Tr. 305).

In August of 1987, in a telephone conversation, Hayes told Schlaifer, "It's a go." (Tr. 305). Schlaifer understood that statement to mean that the terms that he and Hayes had negotiated were acceptable to the Estate and that the Estate was "ready to go." (Tr. 305). At that point, SNC again turned to the Powell Goldstein firm for assistance in drafting a licensing agreement. (Tr. 306). The Estate retained Hayes's brother, Steven Hayes, Esq., of the Parcher & Hayes firm, to negotiate and to assist in the drafting of the licensing agreement. (Tr. 56, 127, 306–07, 583–84). Steven Hayes was experienced in intellectual property and entertainment law. (Tr. 127, 129, 306, 600–02).

The drafting and negotiating process continued into the fall of 1987. During the week of November 9, 1987, Schlaifer met with Hughes, Hayes, and Steven Hayes in New York. During the meeting, Schlaifer asked if there was a "watch deal." Hughes respond-

ed: "There is none. There are no other deals." (Tr. 315–17). A few days later, SNC and the Estate entered into a licensing agreement.

### 3. *The Licensing Agreement*

The licensing agreement between SNC and the Estate (the "Agreement") is dated November 13, 1987. (PX 1). It was negotiated over a three or four month period from August 1987 until it was signed. It went through some 12 drafts. It provided for the Estate to grant to SNC certain rights to use artworks created by Warhol as well as his name, likeness, trademarks, and other assets to develop and market products for "the fashion, home decorating, gift, toy, entertainment and other industries." (PX 1).

Section 4(a) of the Agreement, entitled "Inventory of Artworks," required the Estate to "promptly" provide SNC a list (defined as the "List") of all of Warhol's artworks known to the Estate (defined as the "Existing Artworks"). Attached to the Agreement, and referred to in Section 4(a), was an Exhibit D, which was a list of works that the Agreement recognized "may not be a complete listing." [3]

Exhibit D bore a legend on the first page that provided:

* This list is incomplete.

The Estate agrees to update this list as often as reasonably may be requested by [SNC] in regard to any specific works other than those listed herein which [SNC] wishes to exploit pursuant to the terms of the [A]greement. *No representation is made that each of these works bears a copyright symbol,* but the Estate will place such a symbol upon any works sold[,] publicly displayed or transferred in the future.

(PX 1, Exh. D) (emphasis added). Exhibit D contained what was supposed to be a list of all of Warhol's works of which the Estate was aware. (Tr. 308). It consisted primarily of pages excerpted from a 1985 book edited by Ron Feldman's wife that listed Warhol's works by title and provided certain other information. (PX 8; Tr. 399, 576–77). The listings for some works gave copyright infor-

---

3. SNC was "very anxious" to sign the Agree- ment. (Tr. 502, 951–52).

mation, including who held the copyright. (Tr. 401–03).

Section 4(a) also contained the following language:

The Estate agrees to use its best efforts and to cooperate with [SNC] to ensure that the List shall become an accurate and complete list as soon as is practicable. *Additions of Existing Artworks to the List shall clearly identify those Existing Artworks to which the Estate does not own the Copyrights or otherwise have the right to license to [SNC] free of all rights of any third parties,* specifying the nature of the limitation on the Estate's ability to grant the license.

(PX 1, § 4(a)) (emphasis added).

Section 4(c) described "Celebrity Works." These were artworks that utilized, for example, the likenesses of well known individuals (such as Marilyn Monroe) or cartoon characters (such as Superman and Mickey Mouse). The Agreement contained special provisions with respect to the use of "celebrity works," for the parties acknowledged that special consent might have to be obtained (for example, from the owner of the rights to the cartoon characters) before celebrity works could be used for licensing purposes.

Section 9 of the Agreement contained certain representations and warranties. The Estate represented, for example, that:

(ii) ... the Estate is the sole owner of the Copyrights (other than the right to exhibit previously sold or loaned Existing Artworks) in the Existing Artworks ..., (iii) all Existing Artworks owned by the Estate contain and will contain, prior to publication, appropriate notices regarding the ownership of copyrights therein; (iv) except with respect to Celebrity Works, in which third parties have proprietary rights, and except as noted on Exhibit C, the Estate has and will continue to have the sole and exclusive right to transfer to [SNC] all rights to the Existing Artworks and the Works and the Copyrights, Trademarks and New Trademarks granted hereunder; (v) neither the Existing Artworks, the Trademarks nor the Works infringe the rights of any third parties; (vi) neither the Artist nor the Estate has granted and

the Estate will not grant any right, license or privilege for Licensed Products with respect to the Trademarks, New Trademarks, Copyrights, or the Works or any portion thereof to any person or entity other than [SNC]; (vii) the Estate has not done and will not do ... anything which would violate or impair any right vested, created or arising in favor of [SNC] under this Agreement....

(PX 1, § 9(a)).

Section 9(a) also provided that, upon SNC's request, "the Estate shall reaffirm the accuracy of the warranties contained herein as they relate to specific Existing Artworks." The last sentence of Section 9(a) provided:

An inadvertent breach by the Estate of the warranties contained in subsections (ii) and (iii) of this Section 9(a) shall not be deemed a material breach of this Agreement so long as the Estate, immediately upon receipt of a written notice from [SNC] identifying a breach of warranty, undertakes in good faith and at no expense to [SNC] such actions as shall be necessary to establish its rights as warranted....

The Agreement also granted SNC a license to use the Estate's trademarks. (PX 1, § 2(b)). Excluded from this license were any licenses that had previously been granted to third parties. These third-party licenses were to be listed on Exhibit C to the Agreement, but Exhibit C was a sheet of paper that simply read "N O N E." (PX 1, § 2(b) & Exh. C thereto).

The Agreement did not require SNC to make any "upfront payment" to the Estate, Hughes, or Hayes. (Tr. 417; *see also* Tr. 129). The Agreement did provide, however, for a $50\%$ "split" of net royalties, with guaranteed royalties starting in the third year. (Tr. 129; PX 1 at §§ 6(a), 6(b)). It obligated SNC "to use reasonable efforts and to devote such time, effort and resources to the development of the Works into Licensed Products *as it reasonably deems appropriate.*" (PX 1, § 5(a)) (emphasis added). The Agreement also gave either party the right to terminate it "[i]n the event of a material breach going to the essence" of the Agreement, upon the

failure of the defaulting party to cure after notice of the breach. (PX 1, § 14(a)).

In 1987, SNC incurred $63,941 in expenses in order to perform its obligations under the Agreement. (Tr. 342).

### 4. *The Opinion Letter*

In connection with the execution of the Agreement, the Estate provided an opinion letter that was signed by Francis J. Harvey, Jr., Esq., on behalf of Treanor, Harvey & Horgan on letterhead of Treanor, Harvey & Horgan. The letter was dated October 27, 1987 and was addressed to SNC. It stated in part as follows:

> [W]e have served as counsel to Frederick Hughes, as Executor ... of the Estate of Andy Warhol ..., and the Estate in connection with the negotiation and execution of that certain Agreement between the Estate and [SNC] dated October 27, 1987....

(PX 36). The letter represented that Treanor, Harvey & Horgan had examined the Agreement and other documents and records and that "[t]he Estate possesses all right, title, and interest in the Existing Artworks necessary to enable it to perform under the Agreement." (PX 36).

In fact, however, the opinion letter contained several false statements. Harvey had never reviewed the Agreement or any other document, with the possible exception of Warhol's will, before issuing the opinion letter. (Tr. 893). Nor was it true that Treanor, Harvey & Horgan had represented Hughes or the Estate in negotiations with SNC. (Tr. 893–94).[4] Nor, in fact, was Treanor, Harvey & Horgan even a law firm or partnership; rather, Messrs. Treanor, Harvey and Horgan merely rented office space together. (Tr. 895). Nor had Harvey taken any steps that he could recall to confirm any

of the statements made in the opinion letter. (Tr. 893).

Although the opinion letter was dated October 27, 1987, it was not received by SNC (or its attorneys) until November 23, 1987. (Tr. 596, 854–55; PX 39). Moreover, although it makes reference to an October 27, 1987 agreement, in fact there was no final agreement dated October 27, 1987. (Tr. 484, 595).

The Agreement was signed before the opinion letter was received. (Tr. 481). In the view of SNC's lawyers, however, the Agreement was not a final agreement until "all of the exhibits and changes had been circulated, initialed, appended into one package and delivered as a final agreement." (Tr. 819). One of those exhibits was the opinion letter. (Tr. 818–19; PX 36). As SNC's lawyer acknowledged, however, the Agreement did not provide that it was not final until an opinion letter was received. (Tr. 854).

### 5. *The Estate's Copyright Problems*

In fact, prior to execution of the Agreement, many of Warhol's works had fallen into the public domain. Moreover, there existed a number of agreements with third parties that limited the Estate's rights to certain Warhol artworks. These included agreements with Lewis Allen, the North American Watch Corporation, and Ronald Feldman, which had not been disclosed to SNC prior to execution of the Agreement. (Tr. 420; PX 21). Hence, the Estate did not control all the rights to all of Warhol's works.[5]

### 6. *SNC's Awareness of the Estate's Copyright Problems*

Roger Schlaifer testified at trial that prior to November 13, 1987, he had "absolutely no knowledge that Warhol works were without

---

4. Of course, SNC and its lawyers knew that neither Harvey nor Treanor, Harvey & Horgan had been involved in any of the negotiations over the Agreement.

5. Schlaifer testified, over defendants' objection, that 90% of the works listed in Exhibit D to the Agreement had fallen into the public domain. (Tr. 338–399). I overruled the objection because I was led to believe that Schlaifer was basing

that determination on letters SNC received from the Estate's attorneys, as Schlaifer testified on direct examination. (Tr. 333–38). On cross-examination, however, he also testified that the "approximation" of 90% was based not only on the Estate's letters but also "all the indexes of books that had been published and on the applications that [the Estate] made for copyrights." (Tr. 423).

copyright protection." (Tr. 425; *see also* Tr. 320–21 ("[a]bsolutely no knowledge")). Schlaifer testified that he understood that the Estate represented that it controlled "all the rights" to Warhol's works. (Tr. 296–97).

The record contains substantial, incontrovertible evidence, however, that SNC was aware of possible copyright problems—involving works other than just the "Celebrity Works"—even before the Agreement was signed. Moreover, SNC was advised of actual and further potential problems after the Agreement was signed.

As early as December 1985, when Warhol was still alive, SNC was informed by Hughes that "Warhol owns copyrights on *most* of his images. . . ." (PX 11) (emphasis added).

In August of 1986, SNC was aware of other "deals" that Warhol was pursuing. An August 28, 1986 memorandum states, for example, that "Roger relayed that AW has a number of small 'deals' he is pursuing. An example of this is designing 1,000 art watches, a project currently under consideration." (PX 17).

The Feldman book, which was reviewed by SNC prior to execution of the Agreement and from which Exhibit D was taken, certainly should have raised questions as to whether the Estate owned the copyrights to all of Warhol's works. As Schlaifer acknowledged at trial, he had testified in another lawsuit in this Court in April 1988 as follows:

"Q. When you entered into this agreement [the November 13, 1987 Agreement] prior to the time that it was signed, did you review the list of works that was attached to the [A]greement?

"A. We had gone through it on a number of occasions.

"Q. On a number of occasions?

"A. Yes.

"Q. Did you study the work, the items that were contained in the attachments to the exhibit, or did you merely look at them and note that there were a lot of items?

"A. It was mainly looking at the number of items and part of—and part of formulating a plan on what we would want to use or what we would prioritize to focus on, since there are so many different works.

"Q. And when you went through the works, you noticed that a number of them were copyrighted, did you not?

"A. I think that was apparent.

"Q. You noticed that, though, didn't you?

"A. Yes.

"Q. And as you went through, you also noticed a number were not copyrighted? That would be correct too, wouldn't it?

"A. Yes."

(Tr. 427–28).

Exhibit D to the Agreement showed that many of the works listed bore copyright notices and it described the notices. These included, *e.g.*, "© Andy Warhol" and "© Andy Warhol Enterprises, Inc." Also listed, however, were several copyright notices showing ownership by others: "© Factory Additions 1971," "© Copyright Factory Additions," "© Copyright By Andy Warhol Multiples, Inc. & Castelli Graphics 2," "© Seabird Editions," and "© D.C. Comics, Inc. 1981." No copyright notices at all were listed for many of the works. Exhibit D also reported that certain works had been "published by Ronald Feldman Fine Arts, Inc." and that other works were owned by persons other than the Estate.

In fact, SNC "had many questions about encumbrances all along the way." (Tr. 499). Ricaarda Heising, Esq., one of SNC's attorneys, testified (by deposition) that she "expected," when she was drafting the Agreement in 1987, "that there would be a small limited number of works to which [Warhol] probably did not have the copyrights to any more, but those had never been identified. . . ." (Tr. 947). She expected that perhaps Warhol did not own "every single copyright" because of the "sheer magnitude of what [she] thought was the body of his works." (Tr. 948). She assumed, "based on the fact that his body of work was so large, that it was possible that he had transferred a copyright." (Tr. 948). Moreover, she thought there was a "likelihood" that Warhol might have sold the copyrights to certain works because he "was [a] commercial artist

... [who] had sold his works in such a way to others to exploit them in which case he may have sold a copyright." (Tr. 948–49).

One of SNC's lawyers made notes on October 15, 1987 that read:

> t/c Peter Mack ... if multiple prints out there in public, no copyright protection exists, in the public domain.

(Tr. 852–53; DX EO). The essence of this note was that if the copyright notice was not put on all copies of a print, the work would probably be lost to the public domain. (Tr. 856).

Susanne Nance Schlaifer's handwritten notes of a telephone call with counsel on October 16, 1987 state: "potentially lots of problems if AW didn't © or at least put a © notice on works." (Tr. 501; PX 17B).

On or about October 21, 1987, Steven Hayes conveyed to SNC's lawyers the Estate's desire "to complete the part of Exhibit D [to the Agreement] that deals with limitations on the Estate's copyright ownership, by agreeing to provide the information on a best efforts basis upon request of SNC for specific artworks." (Tr. 953; DX EP).

On or about October 26, 1987, SNC and its lawyers had a conversation about a watch company, whether there was a watch agreement, and the right to market or merchandise watches using Warhol works. (Tr. 955–56; *see* PX 35). Of course, Schlaifer and Hughes had talked about a watch deal back in May 1987 and, indeed, SNC was aware that a watch deal was being considered as early as the summer of 1986. (Tr. 311–12; PX 17).

Notwithstanding the questions and suspicions that SNC had about copyright problems, SNC never asked to inspect the Estate's files for purposes of conducting due diligence prior to execution of the Agreement. (Tr. 421, 937). Nor did SNC ever ask prior to November 13, 1987 for copies of any documents other than the exhibits incorporated into the Agreement. (Tr. 937–38).

This was so even though SNC's lawyers acknowledged that "[w]e will have to be responsible for our own due diligence." (PX 35).

Internal SNC notes dated just six days after the Agreement was signed refer to the "[p]ossible encumberances [sic] of most popular works." (Tr. 497–99; DX F).

In December 1987, just a few weeks after the Agreement was signed, SNC learned of a number of public domain problems. (Tr. 419). SNC continued to learn of public domain problems in January, February, March, and August 1988 and into the fall of 1988. (Tr. 419–20, 752–53).[6] In the months after the Agreement was signed, the Estate's lawyers provided SNC with copies of certain third-party agreements that limited the Estate's rights to certain Warhol works.

In early January 1988, SNC knew there was a possibility that Andy Warhol had not asserted a reservation of rights with respect to his artworks. (Tr. 495–96; *see* DX N).

Gia Partane, an SNC employee, testified (via excerpts from her testimony given during the arbitration proceedings) as follows:

> "[I]n the beginning of the program, since this would be in the beginning of 1988, since we didn't have an inventory list which the [E]state was going to provide to us soon after the ... [A]greement was signed, we didn't really know what we had to license, and so we started going through a lot of art books and books on Warhol and finding as many Warhol images as we could.
>
> "And we assigned numbers to as many of the different images as we could find, and then we would send a request to the [E]state with our catalog numbers and those images listed out and *ask the [E]state if they could tell us the copyright statuses of those various images,* since we didn't have a list."

(Tr. 745) (emphasis added).

In January 1988, SNC received a letter dated January 8, 1988 from a company

---

**6.** Schlaifer's testimony that he concluded, on the basis of the letters from the Estate's attorneys, that 90% of the works had fallen into the public domain further (*see* footnote 5 supra) indicates that SNC could not have reasonably relied on the representation that the Estate controlled all the rights to all the works. If so many of the works were in the public domain, it is inconceivable that SNC could not have known that the Estate did not own all the rights.

named Fotofolio/Artpost Inc. expressing an interest in obtaining a license from SNC to produce postcards, notecards, and posters using Warhol's works. (Tr. 475; *see* DX O). The letter advised SNC that Fotofolio had previously done Warhol postcards "in collaboration" with the Ronald Feldman Gallery. (Tr. 475; DX O). The letter also stated that Fotofolio was writing at the suggestion of Fred Hughes. (Tr. 486; DX O). The letter also stated that Hughes had told Fotofolio in June 1987 that he had been negotiating with SNC and that he referred Fotofolio to SNC directly. (Tr. 488; DX O).

Notwithstanding what it learned about the Estate's copyright problems after the Agreement was executed, SNC continued to work on the project until February 16, 1990, when it brought the instant lawsuit. (Tr. 421). SNC never exercised its right to terminate the Agreement.

## C. *Prior Proceedings*

This action was commenced by the filing of a complaint on February 16, 1990. The original complaint named only the Estate as a defendant; it asserted claims for fraud and breach of contract and sought equitable relief as well as damages. A second action was commenced by SNC against the Estate in 1991, bearing the docket number 91 Civ. 1349 (LLS). *See Schlaifer Nance & Co. v. Estate of Warhol*, 764 F.Supp. 43 (S.D.N.Y.1991).

SNC filed an amended complaint on October 21, 1991, adding Hughes, Hayes, and Vincent Fremont as defendants and adding a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). In the meantime, SNC also commenced arbitration proceedings against the Estate. The arbitrators found that the Estate had breached the Agreement and awarded SNC a total of $4,086,646. Of that amount, $2,303,951 was to reimburse SNC for its "reasonable expenditures allocated to the Warhol program, reduced by its revenues and reduced by the amounts spent before execution of the contract." Some $282,695 was for prejudgment interest. The balance of $1,500,000 consisted of punitive damages, which the arbitrators based primarily on the amount of attorneys'

fees and costs incurred by SNC in the arbitration.

Defendants moved to dismiss the instant action on the basis that SNC had already prevailed in the arbitration. By memorandum endorsement dated September 15, 1992, Judge Stanton denied defendants' motion, holding that, although the arbitrators had sought to restore the parties to the position they would have been in had they not entered into the Agreement, they did not grant SNC any relief with respect to pre-Agreement expenses. Moreover, Judge Stanton held that the individual defendants were not parties to the arbitration and further that the RICO claims had not been presented to the arbitration panel. Judge Stanton did, however, dismiss the second action, 91 Civ. 1349 (LLS).

In May 1993, SNC filed a second amended complaint. Defendants moved to dismiss, and by memorandum endorsement dated February 17, 1994, Judge Stanton granted the motion, dismissing the RICO claims as well as the claims against Hayes and Fremont, with leave to replead as to Hayes and Fremont.

SNC then filed a third amended complaint, although it re-pled only as to Hayes. Defendants again moved to dismiss, on the basis of the language of the Agreement. By memorandum and order dated February 15, 1995, Judge Stanton denied the motion. Drawing all reasonable inferences in SNC's favor, Judge Stanton held that the provisions of the Agreement relied on by defendants did not foreclose SNC's claim of justifiable reliance. *See Schlaifer Nance & Co.*, No. 90 Civ. 1095 (LLS), 1995 WL 66408 (S.D.N.Y. Feb. 15, 1995).

The case was reassigned to the undersigned on February 23, 1995. Trial commenced on June 20, 1995 and the jury returned its verdict on June 27, 1998.

This motion followed.

## DISCUSSION

### A. *Standards Applicable to Motions for Judgment as a Matter of Law*

■ A jury verdict is not to be set aside and judgment entered as a matter of law

pursuant to Fed.R.Civ.P. 50(b) unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.' " *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993) (*quoting Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)); *accord United States v. One Parcel of Property Located at 121 Allen Place,* 75 F.3d 118, 120–21 (2d Cir.1996).

In considering a Rule 50(b) motion, "a trial court must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels,* 992 F.2d at 16. Judgment as a matter of law is to be entered only where there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 168 (2d Cir.1980); *see also Logan v. Bennington College Corp.,* 72 F.3d 1017, 1022 (2d Cir.1995); *Cruz v. Local Union No. 3,* 34 F.3d 1148, 1154 (2d Cir.1994).

## B. *Fraud*

### 1. *Applicable Standards*

Under New York law, to prevail on a claim for fraud, a plaintiff must prove five elements:

> 1) a material false representation or omission of an existing fact, 2) made with knowledge of its falsity, 3) with an intent to defraud, and 4) reasonable reliance, 5) that damages plaintiff.

*Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 276 (2d Cir.1992); *see also Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995); *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). To establish fraudulent concealment, a plaintiff must prove that the defendant had a duty to disclose the material information that was purportedly omitted. *Banque Arabe,* 57 F.3d at 153; *Brass v.*

*American Film Technologies, Inc.,* 987 F.2d 142, 152 (2d Cir.1993). As the parties acknowledged, and as the Second Circuit has made clear, "each element of a fraud claim must be shown by clear and convincing evidence." *Banque Arabe,* 57 F.3d at 153. (*See* Tr. 1024, 1035–36, 1084–85).

Of particular concern in this case is the fourth element: reasonable reliance. To prevail on a claim of fraud, a plaintiff must show that it actually relied on the purported fraudulent statements or omissions and that its reliance was reasonable or justifiable. *Banque Arabe,* 57 F.3d at 156; *Phoenix Canada Oil Co. v. Texaco, Inc.,* 749 F.Supp. 525, 530 (S.D.N.Y.1990); *Harris v. Camilleri,* 77 A.D.2d 861, 431 N.Y.S.2d 65, 68 (2d Dep't 1980). A party's reliance on false statements or omissions is *not* reasonable or justifiable if the party has reason to believe that the representations may be false but fails to inquire into their accuracy. *Keywell Corp. v. Weinstein,* 33 F.3d 159, 164 (2d Cir.1994); *see also Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984) (plaintiffs' reliance on fraudulent representations or omissions not reasonable or justifiable where plaintiffs were "sophisticated businessmen engaged in major transactions [with] access to critical information [who] fail[ed] to take advantage of that access"); *Mallis,* 615 F.2d at 80–81 (party's reliance on fraudulent representations or omissions is not reasonable or justifiable if the party "has the means of knowing, by the exercise of ordinary intelligence, the truth ... of the representation" and fails to "make use of those means"). As the First Circuit wrote in rejecting the fraud claim of plaintiffs who allegedly were defrauded by false oral statements that were contradicted by explicit warnings in an offering memorandum:

> Justifiable reliance cannot be satisfied by ... reckless conduct.... When [plaintiffs] closed their eyes and passively accepted the contradictions between [the alleged fraudulent] statements and the offering memorandum, [plaintiffs] could not be said to have justifiably relied on the misrepresentations.

*Kennedy v. Josephthal & Co.,* 814 F.2d 798, 805 (1st Cir.1987).

The issue presented by this motion for judgment as a matter of law on the claim of fraud is whether, viewing the evidence in a light most favorable to SNC and granting it every reasonable inference that the jury might have drawn in its favor, the jury could have reasonably found that SNC had proven fraud by clear and convincing evidence.

### 2. *The Purported Misrepresentations*

SNC's claims of fraud are based on seven statements or omissions: (i) Hayes's May 18, 1987 statement that "[n]o one is going to get away with using Andy Warhol for free" (Tr. 296); (ii) Hughes's statements on May 18, 1987, in Hayes's presence, that the Estate owned or controlled all the rights to Warhol's works (Tr. 296, 299); (iii) Hayes's August 1987 statement that "[i]t's a go" (Tr. 305); (iv) Hayes's failure to disclose copyright problems when Schlaifer communicated to him SNC's desire "to have the exclusive rights" (Tr. 304); (v) Hughes's response of "there is none," in Hayes's presence, at the November 1987 meeting when Schlaifer asked whether there was a "watch deal" (Tr. 315–17); (vi) representations and warranties in the Agreement; and (vii) the opinion letter.

■ As a threshold matter, Hayes's two affirmative statements cannot support a fraud claim as a matter of law because they simply were not representations of fact. The statement "[n]o one is going to get away with using Andy Warhol for free" was a prediction or promise or statement of intent or puffery. *See, e.g., Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) ("statements will not form the basis of a fraud claim when they are mere 'puffery' or are opinions as to future events"); *Lathrop v. Rice & Adams Corp.,* 17 F.Supp. 622, 628 (W.D.N.Y.1936) (statement that party "intend[ed] to prosecute anyone who infringes upon his patent rights" is a statement of future intention and not a representation of fact); *Zanani v. Savad,* 217 A.D.2d 696, 630 N.Y.S.2d 89, 90 (2d Dep't 1995) ("In general, a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sus-

tain an action for fraud."). Likewise, the statement "[i]t's a go" was not a representation of fact but simply a statement that the Estate was prepared to go forward with the transaction.

■ Hayes's "omissions," or failures to speak, are not actionable because he had no duty to disclose the information that was purportedly omitted. Hayes was not a party to the transaction; rather, he was acting solely as an attorney—the Estate's general counsel. Even assuming that Hayes knew that Hughes was making a fraudulent statement in his presence, Hayes was under no duty to speak because there was no fiduciary or attorney-client relationship between him and SNC. *See, e.g., Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, ——, 114 S.Ct. 1439, 1447, 128 L.Ed.2d 119 (1994) ("[w]hen an allegation of fraud is based upon non-disclosure, there can be no fraud absent a duty to speak"); *Schatz v. Rosenberg,* 943 F.2d 485, 493 (4th Cir.1991) ("attorneys have no duty to 'blow the whistle' on their clients"), *cert. denied,* 503 U.S. 936, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992); *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 496 (7th Cir.1986) ("[w]hen the nature of the offense is a failure to 'blow the whistle,' the defendant must have a *duty* to blow the whistle"); *Morin v. Trupin,* 711 F.Supp. 97, 113 (S.D.N.Y.1989) ("'[n]either lawyers nor accountants are required to tattle on their clients in the absence of some duty to disclose,'" and thus law firm's silence or failure to "blow the whistle" on clients who were allegedly engaging in fraud did not give rise to liability for aiding and abetting clients' fraud) (citations omitted); *Alpert v. Shea Gould Climenko & Casey,* 160 A.D.2d 67, 559 N.Y.S.2d 312, 316 (1st Dep't 1990) (attorneys had no fiduciary duty to third-party in absence of contractual relationship or attorney-client relationship).

Hence, the purported misrepresentations that require further discussion are Hughes's representations that the Estate owned or controlled all the rights to all of Warhol's works, Hughes's denial of the existence of a watch agreement, the representations and

warranties in the Agreement, and the opinion letter.

### a) *The Estate's Purported Control of All Rights*

■ SNC could not have reasonably relied on Hughes's representations that the Estate owned or controlled all the rights to Warhol's works, because SNC should have known that the Estate did not own the copyrights to all of Warhol's works. SNC certainly had reason to believe that Hughes's representations to that effect were false. For example, the incontrovertible evidence showed the following:

—Hughes told SNC in December 1985 that "Warhol owns copyrights on *most* his images" (PX 11); that statement certainly suggested that Warhol did not own the copyrights to *all* his works;

—SNC was told in the summer of 1986 that Warhol was "pursuing" a number of "small 'deals,'" including a watch deal (PX 17);

—The Feldman book, which was reviewed by SNC prior to execution of the Agreement, showed that some copyrights were held by third parties and suggested that many of Warhol's works did not have copyright notices on them (Exh. D to PX 1; Tr. 427–28);

—Because of the volume of works created by Warhol and the fact he was a commercial artist who sold his works in such a way as to exploit them, SNC's lawyers suspected, prior to execution of the Agreement, that Warhol might have transferred the copyright to some of his works (Tr. 947–49);

—SNC suspected, prior to execution of the Agreement, that Warhol might not have put copyright notices on all copies of prints he sold (Tr. 501, 852–53; PX 17B; DX EO);

—The Estate specifically asked, prior to execution of the Agreement, if it could provide the information on limitations on copyright ownership on a "best efforts basis" after execution of the Agreement upon request from SNC (Tr. 953; DX EP); and

—Hughes asked Schlaifer, prior to execution of the Agreement, about doing a watch deal and SNC and its lawyers talked about whether there was a watch agreement (Tr. 955–56; PX 35).

These circumstances certainly suggested, or should have suggested, to SNC that the representations made by the Estate were false. Similarly, these circumstances certainly should have placed SNC, a sophisticated company represented by experienced counsel, "on guard" of the potential copyright problems. *See Mallis*, 615 F.2d at 81. Indeed, SNC's lawyers even acknowledged that "[w]e will have to be responsible for our own due diligence." (PX 35). Yet, SNC conducted no due diligence to speak of; it never asked to inspect the Estate's files nor did it ever ask for any documents (other than the exhibits to the Agreement). (Tr. 421, 937–38). *Grumman*, 748 F.2d at 737; *Phoenix Canada Oil*, 749 F.Supp. at 531 & n. 7; *see also Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.*, 183 A.D.2d 742, 583 N.Y.S.2d 478, 479 (2d Dep't 1992) (where agreement went through six drafts over course of five or six months of negotiations conducted by counsel, by failing to request documentation, plaintiffs assumed the risk that representations were false); *Rodas v. Manitaras*, 159 A.D.2d 341, 552 N.Y.S.2d 618, 620 (1st Dep't 1990) ("[W]here ... a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.").

Under these circumstances, SNC could not have reasonably relied on the purported misrepresentations as a matter of law.

### b) *The North American Watch Deal*

■ The jury's verdict could not have been reasonably based on Hughes's denial of a watch deal, because it could not have found that the representation was material or that SNC reasonably relied on it. SNC knew as early as August 1986 that Warhol was pursuing an art watch deal. Moreover, as Schlaifer testified, Hughes asked him in March or April of 1987 if SNC would have "any prob-

lem" if a friend of Warhol's did a limited edition watch deal. Schlaifer said no, and he never even told his attorneys about that conversation. (Tr. 311–12, 390). Finally, SNC's lawyers specifically discussed the possibility of a competing watch deal in October 1987. Yet, they did not conduct any due diligence. The only inquiry made was Schlaifer's verbal inquiry of Hughes.

Schlaifer never testified that SNC would not have gone forward with the transaction had he known about the North American Watch deal (*see* Tr. 229–30, 311–12, 316–17), and any such testimony would have made no sense in any event, since Schlaifer in fact had already consented to a watch deal. On this record, the jury could not have reasonably found that Hughes's answer of "none" to Schlaifer's question was material or that SNC's reliance on that answer was reasonable.

### c) *The Agreement*

■ Likewise, the jury's finding of fraud cannot be sustained on the basis of the representations contained in the Agreement. First, the Agreement cannot reasonably be construed as representing that the Estate owned all the rights to Warhol's works. The representations in section 9 were keyed to the term "Existing Artworks." Existing Artworks were defined in section 4 as all of Warhol's artworks known to the Estate; they were listed in Exhibit D to the Agreement. The Agreement recognized, however, that Exhibit D "may not be a complete listing." Moreover, Exhibit D itself stated in the legend on the first page that "[n]o representation is made that each of these works bears a copyright symbol." Exhibit D also contained descriptions of works that showed, through copyright notices and otherwise, that rights were held by third parties, including Castelli Graphics 2, Seabird Editions, D.C. Comics, Inc., Factory Additions, and Ronald Feldman Fine Arts. Section 4(a) explicitly stated that "[a]dditions of Existing Artworks to the List shall clearly identify those Existing Artworks to which the Estate does not own the Copyrights or otherwise have the right to license to [SNC] free of all rights of any third parties...." Finally, section 9 contemplated the possibility that the warranties were inaccurate as to specific Existing Artworks, and it provided for the possibility of an inadvertent breach of the warranties. In view of these various provisions, the representations in the Agreement cannot fairly be the basis of a fraud claim. *See, e.g., Scala v. Sequor Group, Inc.,* No. 94 Civ. 0449 (LAP), 1995 WL 225625, at *7 (S.D.N.Y. Apr. 14, 1995) (fraudulent inducement claim barred because reasonable reliance lacking where contract provided for "the possibility" that an event that plaintiff claimed was not intended might occur); *Phoenix Canada Oil Co.,* 749 F.Supp. at 531 & n. 7 (holding in fraud case that plaintiff's "blind reliance" on alleged misrepresentations was not reasonable or justifiable where letter put plaintiff on notice of "possibility" that facts were otherwise); *600 W. 115th St. Corp. v. 600 W. 115th St. Condominium,* 180 A.D.2d 598, 580 N.Y.S.2d 307, 308 (1st Dep't 1992) (holding in fraud case, "any claim of justifiable reliance by plaintiff is dispelled by the plain language of plaintiff's lease").

Second, even assuming the Agreement could reasonably be interpreted as representing that the Estate owned all the rights to all of Warhol's works (with the exception of Celebrity Works), on the basis of the facts set forth above, SNC had reason to believe that that representation could not be true. Moreover, the second, third and fourth sentences of section 4(a), the last two sentences of section 9(a), and Exhibit D gave SNC even further reason to believe that the Estate did not own all the rights to all the works. Yet, again, SNC took no steps to investigate the matter.

### d) *The Opinion Letter*

■ Although SNC now places heavy emphasis on the opinion letter, clearly the letter was unimportant to SNC at the time the Agreement was executed. SNC did not receive the opinion letter until *after* it executed the Agreement. (Tr. 481). Moreover, the opinion letter was defective on its face. Not only was it dated prior to the date of execution of the Agreement, it referenced a nonexistent agreement. Yet, SNC and its attorneys never asked for a corrected opinion letter. The opinion letter also represented that Treanor, Harvey & Horgan had repre-

sented Hughes and the Estate in the negotiations with SNC over the Agreement. SNC and its lawyers knew that statement was false, for they knew that they had never dealt with Harvey or his purported law firm. When they received the opinion letter, however, they did not take the trouble to ask the Estate to provide a proper opinion letter signed by attorneys with whom they had actually dealt.[7]

### 3. *SNC's Post–Agreement Conduct*

██ Further evidence that SNC could not have reasonably relied on the purported misrepresentations is provided by SNC's post-Agreement conduct. In the beginning of the program, for example, just a few weeks after the Agreement was signed, SNC established a procedure whereby Gia Partane regularly sent requests to the Estate to inquire about the "copyright statuses" of various images. (Tr. 745). The fact that SNC established such a procedure so early in the program suggests that it was *not* under the impression that the Estate owned all the copyrights to all the works.

Moreover, SNC had the ability under the Agreement to walk away from the deal in the event of a "material breach going to the essence" of the Agreement. (PX 1, § 14(a)). Hence, if the right to all Warhol's works was of such critical importance to it, SNC could have sought to terminate the Agreement when it learned of the copyright problems and competing agreements in the first few months after the Agreement was signed. Yet, it made no effort to do so.

Hence, the incontrovertible evidence—the testimony of SNC's own witnesses, SNC's own documents, and the terms of the Agreement itself—unequivocally shows that no reasonable juror could have found that SNC reasonably or justifiably relied on the purported misrepresentations. Accordingly, the motion for judgment as a matter of law must be granted.

7. My conclusion that SNC could not have reasonably relied on the opinion letter should not be taken as approval of Harvey's actions. Indeed, his actions were atrocious, as the opinion letter

### C. *Punitive Damages*

Since I have granted defendants' motion with respect to the jury's finding of fraud, the jury's award of punitive damages must be set aside as well. Even assuming the jury's verdict on liability should be sustained, however, independent grounds exist for granting the motion with respect to SNC's claims for punitive damages.

### 1. *Applicable Standards*

██ Under New York law, punitive damages are appropriate in a fraud action when the proof establishes "gross, wanton, or willful fraud or other morally culpable conduct." *Borkowski v. Borkowski*, 39 N.Y.2d 982, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 (N.Y. 1976); *see also Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 649 (2d Cir.1989) (punitive damages are appropriate "when fraud is gross, wanton, or willful"); *Saint Calle v. Prudential Ins. Co.*, 815 F.Supp. 679, 688 (S.D.N.Y.1993) ("punitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable conduct' "); *Coldwell Banker Residential Real Estate Serv., Inc. v. Eustice*, 190 A.D.2d 839, 594 N.Y.S.2d 52, 53 (2d Dep't 1993) (punitive damages are appropriate when fraudulent conduct is "gross, wanton, or deliberate and demonstrates a high degree of moral culpability"). Also, as SNC conceded at trial, it had to prove its entitlement to punitive damages by clear and convincing evidence. (Tr. 1083–85).

██ In some respect, all fraud contains an element of "gross, wanton, or willful" conduct. Yet, of course, punitive damages should not be awarded in every case in which fraud is found. *Walker v. Sheldon*, 10 N.Y.2d 401, 223 N.Y.S.2d 488, 491, 179 N.E.2d 497, 498–99 (N.Y.1961) (punitive damages not available for "ordinary fraud"); *accord Wallach Marine Corp. v. Donzi Marine Corp.*, 675 F.Supp. 838, 842 (S.D.N.Y.1987) (punitive damages not available for "mere fraud"); *Shults v. Henderson*, 625 F.Supp. 1419, 1426 (W.D.N.Y.) (punitive damages not

contained several statements that were, as Harvey well knew, absolutely and unequivocally false.

available for "ordinary fraud"), *aff'd*, 805 F.2d 391 (2d Cir.1986). Instead, punitive damages are intended to punish the offending party and to discourage that person as well as others from engaging in similar wrongful conduct in the future. *Jeffries v. Harleston*, 21 F.3d 1238, 1249 (2d Cir.1994) (*citing Restatement (Second) on Torts* § 908 cmt. a (1979)), *vacated on other grounds*, — U.S. —, 115 S.Ct. 502, 130 L.Ed.2d 411 (1994). Thus, punitive damages may be available when, for example, the false statements giving rise to the fraud were made maliciously or were "actuated by evil motives." *Accusystems, Inc. v. Honeywell Information Sys., Inc.*, 580 F.Supp. 474, 483 (S.D.N.Y.1984); *see also Walker*, 223 N.Y.S.2d at 490, 179 N.E.2d at 498 ("Punitive or exemplary damages have been allowed in cases where the wrong complained of is morally culpable, or is actuated by evil and reprehensible motives, not only to punish the defendant but to deter him, as well as others who might otherwise be so prompted, from indulging in similar conduct in the future.").

The determination as to whether a party's conduct crosses the line from mere fraud to morally culpable conduct deserving of punishment turns "on a considered observation of the defendant's conduct in light of the ordinary morals of the marketplace and on an assessment of whether the punishment is needed and will be effective as a deterrent." *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118–19 (2d Cir.1986). Thus, a determination that a particular fraud is more worthy of punitive damages than another simply boils down to a matter of degree. The decision does not turn, however, on the number of instances of fraudulent conduct. *See id.* at 1118. ("The test is not the number of wrongful acts...."). Rather, the decision whether to award punitive damages must be based on an overall appraisal of defendant's conduct, motive, and mental state. Punitive damages should be awarded only when the defendant's conduct "is sufficiently willful and egregious to indicate a need for something more than compensatory relief." *Id.*

Some examples may be helpful. In *Accusystems*, the defendant fraudulently induced the plaintiffs to enter into a contract for the purchase of computer hardware and software. Defendant made material misrepresentations, either knowing them to be false or recklessly without regard for their truth or falsity. 580 F.Supp. at 482. Following a bench trial, the court found that plaintiffs had proven fraud; it held, however, that plaintiffs were not entitled to punitive damages. It denied the request for punitive damages because defendant's misrepresentations were not made "maliciously or wantonly" or as the result of "evil motives." 580 F.Supp. at 482. Rather, the court held that because the defendant likely thought that plaintiffs, with their experience, could make the computer system work, the "moral culpability" required for an award of punitive damages was not present. 580 F.Supp. at 482.

In *Key Bank of New York v. Diamond*, 203 A.D.2d 896, 611 N.Y.S.2d 382 (4th Dep't 1994), the defendant defrauded plaintiff by pledging 32,000 shares of stock, which defendant knew was worthless, as collateral for a loan. The jury awarded both compensatory and punitive damages. The Fourth Department set aside the award of punitive damages, holding that the pledge of worthless stock, "although fraudulent, [did] not ... evince 'that high degree of moral culpability' necessary to sustain an award of punitive damages." 611 N.Y.S.2d at 383. *See also Sangimino v. Sangimino*, 176 A.D.2d 872, 575 N.Y.S.2d 515, 517 (2d Dep't 1991) (husband's false representation that he would purchase new home in both his and his wife's name was sufficient basis for fraud cause of action, but would not support a claim for punitive damages "since the husband's alleged fraud did not evince a high degree of moral turpitude"); *Yuzwak v. Dygert*, 144 A.D.2d 938, 534 N.Y.S.2d 35, 36 (4th Dep't 1988) (false representations that a horse was "quiet and easy to handle" and would make a "good horse for a youth," while sufficient to support a claim for fraud in inducing the purchase of the horse, did not constitute conduct sufficient to warrant punitive damages).

### 2. *Proof of the Requisite Culpability*

■ Here, SNC did not show, by clear and convincing evidence, that any of the de-

fendants acted with the degree of moral culpability necessary to support an award of punitive damages. Indeed, defendants' conduct was at worst reckless, for at least six reasons.

First, SNC was not a naive, innocent victim being preyed upon by defendants. To the contrary, SNC was a sophisticated, successful company represented by a large Atlanta law firm. The Agreement was negotiated over a three to four month period and it went through some 12 drafts.

Second, it was Schlaifer who conceived the idea of a Warhol program, and he initiated the discussions with Warhol. In an effort to "sell" Warhol on the program, SNC put together an elaborate presentation that included a videotape. At one point, Warhol suspended the discussions and Schlaifer was disappointed as a result. After Warhol's death, Schlaifer continued the discussions with the Estate and he "enthusiastically" suggested that a "worthwhile" program could still be done. (Tr. 289–90). Indeed, SNC was "anxious" to enter into the Agreement. (Tr. 502, 951–52). In short, defendants did not pursue SNC; if anything, it was the other way around.

Third, defendants had nothing to gain by the purported fraudulent scheme. SNC provided no "upfront" money under the Agreement, and the minimum royalties provisions did not take effect until after the first two years. Hughes and Hayes would have profited from their purported fraud only if the program succeeded and the assets of the Estate increased as a result. Defendants had nothing to gain from deceiving SNC into entering into a transaction that was doomed to failure because the Estate did not own the necessary rights.[8]

Fourth, Hughes made at least two disclosures that were wholly inconsistent with any intent to defraud. It is undisputed that Hughes told Schlaifer in March or April of 1987 about the possibility of another watch deal and asked for SNC's consent. If Hughes had truly wanted to deceive SNC, he would not have disclosed the possibility of another, competing deal. In addition, Hughes disclosed to Fotofolio in June 1987 that he had been negotiating with SNC about a licensing program and he suggested that Fotofolio contact SNC directly. Again, if Hughes had truly wanted to defraud SNC, he would not have suggested that Fotofolio communicate with SNC directly.

Fifth, although SNC presented evidence that it committed substantial resources to the project, it is undisputed that its expenses in preparing for performance of the Agreement amounted to only $63,941. In addition, the Agreement was somewhat one-sided in the sense that it obligated SNC to use only "reasonable efforts" to perform the Agreement and it gave SNC the discretion "to devote such time, effort and resources to the development of the Works into Licensed Products *as it reasonably deems appropriate.*" (PX 1, § 5(a) (emphasis added)). Hence, SNC had the right, within reason, to devote as much or as little time, effort, and resources as *it* saw fit, and it also had the ability to terminate the Agreement. Although it learned early on that there were significant public domain problems, SNC did not choose to terminate the Agreement. In other words, if defendants had actually wantonly and maliciously induced SNC to enter into the Agreement, once SNC learned that it had been deceived it could have taken steps to terminate the relationship. It did not.

Finally, even assuming that the jury could have properly found the requisite moral culpability on the part of Hughes and the Estate, it certainly could not have reached that conclusion with respect to Hayes. Again, Hayes was not a party to the Agreement. He acted at all times as the Estate's attorney. He was under no duty to "blow the whistle" on his clients; his refusal to do so cannot, under any stretch of the imagination, be the basis for an award of punitive damages.

Taking into account all the circumstances of the case, including defendants' conduct,

---

8. Indeed, even assuming that defendants did falsely represent that the Estate controlled all the rights, the evidence suggests that defendants must have thought that SNC could develop a worthwhile program with whatever rights they knew the Estate did control. *See Accusystems,* 580 F.Supp. at 482.

motive (or lack thereof), and mental state, and construing the evidence in the light most favorable to plaintiff, I hold that no reasonable jury could have found that SNC had proven by clear and convincing evidence that defendants had acted with the evil motive or moral culpability necessary for an award of punitive damages. Nor would an award of punitive damages in the unusual circumstances of this case accomplish the goal of discouraging others from engaging in similar conduct in the future.

### CONCLUSION

Defendants' motion for judgment as a matter of law is granted. Judgment will be entered dismissing the third amended complaint with prejudice.

SO ORDERED.