**SCHLAIFER NANCE & CO., INC., Plaintiff,**

v.

**Estate of Andy WARHOL, et al., Defendants.**

No. 90 Civ. 1095(DC).

United States District Court, S.D. New York.

June 3, 1998.

Powell, Goldstein, Frazer & Murphy L.L.P. by John T. Marshall, Atlanta, GA, for Plaintiff.

Coblence & Warner by Paul J. Hanly, Jr., New York City, for Defendants.

## OPINION

CHIN, District Judge.

In this case, plaintiff Schlaifer Nance & Co., Inc. ("SNC") alleged that it was fraudulently induced into entering a licensing agreement with the defendant Estate of Andy Warhol (the "Estate") by defendants' false representations that the Estate owned all the copyrights to all of Warhol's works of art. SNC and its attorneys knew, however, that the proposition could not be true, for many of Warhol's works had fallen into the public domain and the copyrights to certain of his other works had been granted to others. Even though SNC and its lawyers knew the truth, SNC entered into the licensing agreement nonetheless, without conducting any due diligence or doing any investigation.

Although it was clear to both SNC and its lawyers that they could not prove reasonable reliance, a necessary element of the fraud claim, they filed this action, alleging that SNC had relied on the representations. To the extent there was any doubt at the outset of the case as to the validity of the fraud claim, that doubt was eliminated in the three months before trial when SNC's own attorneys produced certain documents and gave certain testimony that revealed the frivolous nature of the claim of reasonable reliance. Moreover, although SNC's pre-contract, out-of-pocket losses from the alleged fraud amounted to no more than $63,941, or $281,-441 at best, SNC's attorneys expended extraordinary resources prosecuting the claim. Unfortunately, the Estate was forced to incur substantial legal expenses itself in defense.

The Estate moves for sanctions against SNC and its attorneys—Powell, Goldstein, Frazer & Murphy LLP ("Powell Goldstein"), James C. Rawls, Esq., C. Scott Greene, Esq., and Paul K. Rooney, Esq. The motion is granted, for I find that SNC and its attorneys prosecuted a meritless claim in bad faith.

Our adversarial system of justice depends on lawyers who advocate for their clients zealously. At the same time, our system works only if attorneys also meet their obligations as counselors and officers of the court. Here, SNC's attorneys performed their role as advocates to a fault: they pre-vailed before a jury on a claim that never should have been brought. They failed, however, in their other two roles. As counselors, they should have advised their client to withdraw the fraud claim. Instead, they permitted their client to prosecute a claim that had no basis in fact and that was not worth pursuing and certainly not in the manner it was pursued here. As officers of the court, they pursued a meritless claim in a vindictive and vexatious manner, spurred on by the belief that they could recover attorneys' fees as punitive damages. Indeed, in the end they expended $2.6 million in time and disbursements chasing a claim that was worth only $63,941.

Accordingly, sanctions in the amount of $400,000 are imposed against SNC, Powell Goldstein, Rawls, Greene, and Rooney, jointly and severally, pursuant to 28 U.S.C. § 1927 and the Court's inherent power.

## BACKGROUND

### A. The Facts

The facts of this case are detailed in my prior decision, *Schlaifer Nance & Co. v. Estate of Andy Warhol*, 927 F.Supp. 650 (S.D.N.Y.1996), *aff'd*, 119 F.3d 91 (2d Cir. 1997), and may be summarized as follows:

In November 1987, SNC and the Estate entered into a licensing agreement (the "Agreement") granting SNC the right to use Warhol's artworks, name, likeness, and trademarks to develop and market fashion, home decorating, gift, toy, and entertainment products. I assume for purposes of this motion that, prior to the execution of the Agreement, the Estate and defendants Frederick Hughes and Edward W. Hayes falsely represented that the Estate owned all the rights to all of Warhol's works and that defendants failed to disclose that certain works had fallen into the public domain and that the copyrights to certain other works had been granted to others.

As set forth in more detail below, SNC was well aware of the existence of copyright problems with Warhol's works even before it entered into the Agreement. In addition, SNC's lawyers—members of the Powell Goldstein firm—also knew that certain of

Warhol's works had fallen into the public domain and that the copyrights to other works had been transferred to others. Notwithstanding this knowledge, SNC did not do any due diligence or investigation and entered into the Agreement nonetheless.

Within a few weeks after the Agreement was signed, SNC started communicating with the Estate and its lawyers about copyright problems. SNC continued to bring public domain problems to the Estate's attention throughout 1988. *See* 927 F.Supp. at 658. Although SNC had the right to terminate the Agreement for a "material breach," it never sought to do so. Instead, SNC continued to work on the project until February 16, 1990, when it brought the instant lawsuit. *Id.* at 659, 664.

**B.** *The Pleadings and Pre–Trial Motions*

SNC's original complaint in this action, which was initially assigned to Judge Stanton, alleged fraudulent inducement and breach of the Agreement against the Estate only.[1] The crux of the fraudulent inducement claim was that the Estate represented to SNC that "it had acquired all of Andy Warhol's rights, title and interests to his works of art, including, without limitation, paintings, drawings, sculpture and works of applied art ('Existing Artwork')," that the representation was false because "the Estate did not have the sole and exclusive rights to the copyrights in all of the Existing Artwork," and that had SNC "known that the representations and warranties were false, it would not have entered into the Agreement with the Estate." (Compl. ¶¶ 14, 17, 40; *see also* Am.Compl. ¶¶ 19, 22, 38, 43, 47; Sec.Am. Compl. ¶¶ 29, 34, 50, 55, 59).

SNC later filed a second lawsuit against the Estate on February 22, 1991 for breach of the Agreement. *See Schlaifer Nance & Co. v. Estate of Warhol,* 764 F.Supp. 43 (S.D.N.Y.1991) (Stanton, J.). The Agreement, however, contained an arbitration clause that required some of SNC's claims to be arbitrated. SNC commenced arbitration

proceedings and obtained an arbitration award on June 18, 1991 of $4,086,646, of which $1.5 million was awarded as punitive damages. In their award, the arbitrators explained that the $1.5 million in punitive damages, or virtually all of it, was intended to reimburse SNC for its $1.46 million in attorneys' fees and costs incurred in the arbitration.

On October 21, 1991, after the arbitration award, SNC filed an amended complaint in this case, which included the original fraud claim against the Estate as well as new fraud and civil RICO claims against the three individual defendants, Frederick Hughes, Edward W. Hayes, and Vincent Fremont.[2] Defendants moved to dismiss, both the instant action as well as the second case, on the basis that SNC had prevailed on its claims in the arbitration.

By memorandum endorsement dated September 16, 1992, Judge Stanton denied the motion as to the instant case and granted, on consent, the motion as to the second case. Judge Stanton held that the arbitrators had sought to restore the parties to the position they would have been in had there been no Agreement, but they did not award SNC damages for pre-contract expenses (which the arbitrators described as amounting to $281,441) because the Estate's liability for those expenses had not been submitted for arbitration. Judge Stanton concluded that the arbitrators had awarded damages only for post-contract expenses. In addition, Judge Stanton noted that the individual defendants were not parties to the arbitration and that the RICO claims had not been presented to the arbitrators.

Defendants moved for partial reargument with respect to the RICO claims. Judge Stanton denied the motion by memorandum endorsement filed January 21, 1993. On February 26, 1993, he entered an order formally dismissing the second case.

On May 18, 1993, SNC filed a second amended complaint in this case, containing a fraud claim against the Estate and fraud and

---

1. The complaint was signed by Rooney. At that point, Powell Goldstein had not appeared as of record in the case.

2. The amended complaint was signed by Rooney, Rawls, and Greene as well as Joseph D. Wargo, another Powell Goldstein attorney.

civil RICO claims against the three individual defendants.[3] Defendants moved to dismiss, and, by memorandum endorsement filed February 18, 1994, Judge Stanton granted the motion in part, dismissing the RICO claims against all parties. He also dismissed the fraud claim as to Hayes and Fremont, with leave to replead. He denied the motion insofar as it sought dismissal of the fraud claim against the Estate and Hughes, holding that the fraud claim was pled with sufficient particularity as to them.

SNC then filed a third amended complaint on April 4, 1994, repleading fraud as to Hayes but not as to Fremont, and omitting the RICO claims that had been dismissed.[4] Defendants moved to dismiss the third amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), arguing that, as a matter of law, SNC could not have relied on the alleged misrepresentations because they were contradicted by the language of the Agreement. Judge Stanton denied the motion, holding that the provisions of the Agreement cited by defendants did not "foreclose SNC's claim of justifiable reliance." *Schlaifer Nance & Co. v. Estate of Warhol*, No. 90 Civ. 1095, 1995 WL 66408, at *1 (S.D.N.Y. Feb. 15, 1995). Judge Stanton based his analysis, however, only on the allegations of the third amended complaint and the provisions of the Agreement; he did not consider any extrinsic evidence, as the motion challenged only the sufficiency of the pleading.

### C. *The Final Pre–Trial Preparations*

On February 23, 1995, the case was reassigned to the undersigned for trial. Only one claim remained, the fraud claim against the Estate, Hughes, and Hayes. I held a pretrial conference on March 9, 1995, at which time I set the case down for trial in June 1995. (*See* 3/9/95 Tr. at 39).

---

3. The second amended complaint was also signed by Rooney, Rawls, Greene, and Wargo.

4. The third amended complaint was signed by Rooney and Rawls, who also apparently signed for Greene and Wargo.

5. SNC's decision to "voluntarily" produce the documents was no doubt influenced by the fact

During the final preparations for trial, three matters were raised that are of particular significance to the current motion for sanctions: (1) the disclosure of evidence that SNC knew of problems with the copyrights to many of Warhol's works; (2) the issue of the maximum amount of compensatory damages recoverable by SNC; and (3) SNC's attorneys' fees and expenses.

### 1. *Disclosure of Evidence of SNC's Knowledge*

By letter dated March 29, 1995, Paul J. Hanly, Jr., one of defendants' attorneys, inquired of SNC's counsel as to whether all responsive documents had been produced in response to the Estate's document requests served on SNC in 1990 and 1993. Hanly noted that he found it "striking" that no documents from the files of SNC's lawyers were produced in 1990 and only a few pages in 1993, when SNC made voluminous document productions. In addition, although SNC provided a privilege log in 1993, it listed no documents from SNC's attorneys' files concerning the negotiations or the discussions alleged in the third amended complaint.

Following further exchanges of correspondence as well as the service by defendants of additional formal document requests, SNC produced in excess of 3,000 pages of documents. This was on April 19, 1995, just two months before trial. Although these documents had been requested in 1990 and 1993, virtually none had been previously produced. In addition, in May 1995, Powell Goldstein produced the timesheets of the attorneys who had negotiated the Agreement. SNC contends that these additional documents and timesheets were privileged and that they were produced voluntarily.[5]

Many of the documents showed that SNC and its attorneys were actually aware of, or suspected, that there were many problems with respect to the Estate's ownership of copyrights.[6] For example, the documents

---

that it was seeking to compel defendants to produce their counterpart documents, as to which defendants had claimed a privilege. (*See* 3/9/95 Tr. at 3; Order dated June 6, 1995).

6. At a hearing on May 17, 1995, counsel for defendants commented on the documents as follows:

showed that in the weeks before the agreement was signed: (1) David Armitage, Esq., a Powell Goldstein attorney, made a note after speaking to a copyright specialist: "if multiple [Warhol] prints out there in public, no copyright protection, in the public domain," *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d at 99 (2d Cir.1997); *see also Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 927 F.Supp. 650, 658 (S.D.N.Y.1996) (DX EO); (2) Armitage made a note after speaking with Marcia Watts, an employee of plaintiff, entitled "Potential Problems," which listed several works appearing in the Feldman book; and (3) Suzanne Schlaifer spoke to Armitage and noted that there were "potentially lots of problems if AW didn't [copyright] or at least put [copyright] notice on works," 119 F.3d at 99, 927 F.Supp. at 658 (PX 17B). There were other, similar documents as well. *See* 119 F .3d at 99–102, 927 F.Supp. at 656–59, 662–64. Despite this knowledge and these suspicions, SNC did not investigate and entered into the transaction anyway.

Moreover, at a deposition taken on June 9, 1995, less than two weeks before the start of trial, Riccarda Heising, Esq., another Powell Goldstein attorney, admitted at a deposition that she "expected," when she was drafting the Agreement, that Warhol did not own copyrights to all his works because of the "sheer magnitude of ... the body of his works" and because he was a commercial artist who sold his works in a way that others could "exploit them." 927 F.Supp. at 657. (*See* Trial Tr. 946–49).

In addition, Roger Schlaifer acknowledged at trial that he had testified in another lawsuit in the Southern District of New York in April 1988 that he had noticed, before he signed the Agreement, that a number of the artworks were not copyrighted, *see* 927 F.Supp. at 657. The language of the Agreement itself also "provided notice of copyright problems." 119 F.3d at 100.

MR. HANLY: [Plaintiff's] case is on the merits extremely weak, and we are going to show your Honor that at the time of trial; and in that regard, I suggest to the court the [plaintiff has] produced only three weeks ago a volume of materials that blows [its] case away....

For these reasons, it is abundantly clear that SNC could not have reasonably relied on defendants' representations that the Estate owned all the rights to all of Warhol's works. As the Second Circuit observed:

> Throughout the trial, SNC maintained that it did not know that many of Warhol's works lacked copyright protection. · The testimony and documentary evidence, however, paint a different tableau.
>
> ... From the outset, SNC had notice that Warhol did not control all the rights to his known works of art.
>
> . . .
>
> A clear message was emerging [prior to execution of the Agreement]: exclusive ownership of copyrights to all of Warhol's known artwork was an impossibility.

119 F.3d at 99.

### 2. SNC's Recoverable Compensatory Damages

As the trial date approached, defendants moved for an order limiting the amount of compensatory damages SNC could recover at trial to $63,941, which represented SNC's pre-contract expenses incurred after Warhol's death. As the arbitration panel had awarded SNC damages in 1991 for post-contract expenses, SNC could only seek to recover pre-contract expenses in this action. SNC had known as early as June 18, 1991, however, when the arbitrators rendered their award, that its pre-contract expenses—including expenses incurred *prior* to Warhol's death—amounted to $281,441 at the most. Defendants argued that because the pleadings had only alleged fraud after Warhol's death, SNC could only recover pre-contract expenses incurred *after* his death, which totalled only $63,941.

By order dated June 15, 1995, I ruled that compensatory damages would be limited, at most, to $281,441 and that I would defer until trial a decision on whether to limit compensa-

[Plaintiff and its attorneys] produced those materials, Judge, 3,354 pages of it, and we will show your Honor and we would move for summary judgment if we hadn't spent so much money in this case, we will show your Honor that these documents blow them away....
(5/17/95 Tr. at 40–41, 42).

tory damages to $63,941. Eventually, however, I ruled at trial that SNC could not seek damages for any alleged fraud occurring before Warhol's death because no such claim had been asserted in any of the four complaints that SNC had filed in the case. (*See* Trial Tr. at 179, 250, 268–72; *see also* 6/8/95 Tr. at 27–28; Trial Tr. at 274–77, 987–88). In view of my ruling, SNC's attorneys were "persuaded that it would be error for the Court to permit us to ask this jury to give us damages for a time before the Court has permitted us to prove there was fraud." (Trial Tr. at 274). Hence, based on my denial of SNC's request to permit an amendment to the third amended complaint to seek damages for fraud allegedly occurring before Warhol's death, SNC conceded that it could recover at best $63,941 in compensatory damages.

### 3. Attorneys' Fees and Costs

At a hearing held on June 8, 1995 to discuss a number of issues, defendants' counsel made an oral motion in limine to preclude SNC from offering evidence of its fees and expenses incurred in litigating the case, as SNC's lawyers had indicated they intended to do. (*See* 6/8/98 Tr. at 28–29). Rawls explained SNC's position as follows:

> MR. RAWLS: The precedent is well settled, as part of the substantive law of New York, ... *it is the identical thing the arbitrators did that we will ask this jury to do,* and that is to consider an award of the attorneys['] fees in the course of considering punitive damages.

(*Id.* at 30) (emphasis added). In essence, SNC was proposing that the jury, in considering the claim for punitive damages, be permitted to be told how much SNC had spent in legal fees and expenses litigating the case. (*Id.* at 33). Hence, SNC was seeking to duplicate what it had achieved in 1991, when it persuaded the arbitration panel to award $1.5 million in punitive damages, of

which $1.46 million was assessed to reimburse SNC for attorneys' fees and expenses.

I asked the parties to submit authorities on the issue. They did so, and after reviewing the authorities, I ruled that SNC would not be permitted to present evidence of its attorneys' fees to the jury. *See* Order dated June 15, 1995. SNC's authorities were not persuasive, and I held that the jury would not be permitted to hear evidence of SNC's attorneys' fees for four reasons:

> First, a holding that would permit a plaintiff to recover legal fees as part of punitive damages is, in my view, contrary to the general 'American Rule that each party bears its own attorneys' fees.... Second, permitting the jury to take into account the amount that plaintiff has spent on legal fees in its consideration of punitive damages would inappropriately introduce or mix a compensatory element into punitive damages. Third, the probative value of the amount of attorneys' fees incurred is substantially outweighed by the danger of undue prejudice, for most lay jurors undoubtedly would be shocked at the amount of fees incurred by plaintiff in this litigation. Fourth, permitting the plaintiff to introduce evidence of its legal fees would raise potentially time-consuming issues— such as the reasonableness of hours expended, the reasonableness of hourly rates utilized, the quality of the work performed—that are more appropriately decided by a judge rather than a jury.

(6/15/95 Order at 2).

Notwithstanding my ruling, SNC's attorneys' fees and expenses continued to be the subject of discussion at trial outside the presence of the jury. At some point, I was provided with information that led me to believe that SNC had spent some $750,000 in legal fees and costs in pursuing this case, and I expressed my concern that so much had been spent pursuing a $63,941 claim.[7] SNC's counsel at trial later attempted to explain

---

7. In the midst of the trial, I made the following observation: "I am appalled that on a $63,000 claim, $750,000 of legal fees have been spent." (Trial Tr. at 676). I do not recall when I was first told of the $750,000 amount or precisely what I was told, and I have not been able to find any prior mention of the $750,000 figure in the trial transcript or anywhere else in the record. It is clear, however, that I was told the number by SNC's counsel at some point. Of course, I had no idea at the time that the actual time and expenses were substantially in excess of $750,-000.

and minimize the legal expenses. (*See* Trial Tr. at 987–91). The issue of SNC's attorneys' fees and expenses was then dropped, not to re-surface until the instant motion was filed after the trial and appeal.

## D. *The Trial, Post–Trial Motions, and the Appeal*

Trial commenced on June 20, 1995. On several occasions, I expressed concern as to whether SNC's claim had any merit. (*See* Trial Tr. at 466, 675–76, 866, 994, 1004–05). Defendants made their Rule 50 motion for judgment as a matter of law at the conclusion of SNC's case and I reserved decision. (*See id.* at 931). They renewed the motion at the close of all the evidence and presented argument. (*See id.* at 962–86). In the end, I reserved decision and permitted the case to go to the jury. (*See id.* at 1015, 1019). I did so only because the Second Circuit has suggested that it is better practice to let the jury decide a case and then set it aside to avoid the need for a retrial in the event of a reversal on appeal. (*See id.* at 877).

The jury returned its verdict on June 27, 1995, finding that all three defendants had fraudulently induced SNC to enter into the Agreement and awarding punitive damages against defendants in the amount of $1 million each. The parties had agreed that, in the event SNC prevailed, the amount of compensatory damages would be $63,941. Hence, if permitted to stand, the verdict would have been $3,063,941.

Defendants moved to set aside the verdict. On May 15, 1996, I granted the motion, concluding that "[t]he jury's finding of fraud and its award of a total of $3 million in punitive damages could only have been the product of sheer surmise and speculation." 927 F.Supp. at 652. My decision to set aside the verdict was based primarily on my conclusion that no reasonable jury could have found that SNC reasonably relied on defendants' false representations that the Estate owned all the rights to all of Warhol's works.

That decision was affirmed by the Second Circuit. 119 F.3d 91 (2d Cir.1997).

## E. *The Instant Motion for Sanctions*

After the mandate was issued, the Estate's attorneys wrote a letter to the Court requesting a conference to discuss the filing of a motion against SNC and its attorneys for sanctions. After SNC's counsel responded, I issued an order on November 11, 1997 setting forth some preliminary thoughts, encouraging the parties to try to resolve the matter, and setting a schedule for the submission of briefs in the event the parties could not resolve the matter. The parties were not able to resolve the matter and the instant motion for sanctions was filed.

In his initial affidavit in opposition to the sanctions motion, Rawls explained that Powell Goldstein entered into a "partial contingent fee agreement" with SNC in December 1991 and a "complete contingent fee agreement" with SNC in July 1994. Although he did not reveal in that affidavit how much time his firm put into this case in total, he reported that SNC's legal fees and expenses in 1990 and 1991 "approximated $750,000 more than the legal expenses that had been recovered in the arbitration." (Rawls Aff. ¶ 8). The arbitrators had awarded $1.46 million in punitive damages to reimburse SNC for its attorneys' fees and expenses in the arbitration.

In addition, Rawls explained in his initial affidavit that after 1991, Powell Goldstein's "investment in the pursuit of the contingent fee aspect of this litigation (both the fraud claim and the RICO claim and the appeal) had a value at our normal hourly rates of more than $750,000 *beyond our compensation.*" (*Id.*) (emphasis added). Rawls did not, however, disclose what amount was paid to Powell Goldstein.

Finally, in his initial affidavit in opposition to the motion, Rooney reported that he had entered into a contingency fee arrangement with SNC starting in December 1991. (*See* Rooney Aff. ¶ 15). He did not disclose what he was paid by SNC before then, but he did reveal that from "that time through the appeal, [his] office expended over $400,000 in hours." (*Id.*).

Because the affidavits were incomplete and I felt the issue of SNC's attorneys' fees and

disbursements was relevant to the motion before me, I issued an order on May 28, 1998 requesting certain additional information concerning attorneys' fees, hours expended, and disbursements, both from SNC and the Estate. That additional information was provided. It showed that SNC's lawyers expended almost $2.6 million in time and disbursements on this case, not including time and disbursements on the arbitration or the second lawsuit.[8]

The Estate also provided a supplemental affidavit from Paul J. Hanly, Jr., Esq., reporting that the Estate had paid $900,047 in legal fees and expenses in connection with this case from September 1994 through December 1996.

## DISCUSSION

### A. Sanctions

In determining whether to impose sanctions on an unsuccessful litigant and its attorney, a court bears a "heavy responsibility," for the imposition of sanctions not only runs contrary to the general American rule that each party should bear its own legal expenses, win or lose, it imposes a financial burden on both the litigant and its lawyer and, more importantly, "carries with it condemnation of [the lawyer's] professional conduct." *Tedeschi v. Smith Barney, Harris Upham & Co.*, 579 F.Supp. 657, 661 (S.D.N.Y.1984) (Weinfeld, J.), *aff'd*, 757 F.2d 465 (2d Cir.), *cert. denied*, 474 U.S. 850, 106 S.Ct. 147, 88 L.Ed.2d 122 (1985). Consequently, the Second Circuit has repeatedly warned that "sanctions must be imposed with

caution." *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253, 1259 (2d Cir.1996) (Rule 11); *accord Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 50, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (court's inherent power); *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir.1994) (Rule 11).

■ To ensure that sanctions will not be imposed haphazardly, the Second Circuit has delineated three procedural safeguards that must be met before a district court may impose sanctions. First, the party or attorney facing sanctions must be given "specific notice of the conduct alleged to be sanctionable and the standard by which that conduct will be assessed, and an opportunity to be heard on that matter." *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 97 (2d Cir.1997). Second, the court must consider separately the different "sanctions machinery" relied on in the request for sanctions. *United States v. International Bhd. of Teamsters*, 948 F.2d 1338, 1346 (2d Cir.1991). Third, the court must specifically identify the sanctionable conduct and explain why it is imposing the sanctions. *See MacDraw*, 73 F.3d at 1259. I discuss each of these three areas. I conclude by discussing the appropriate amount of sanctions to assess in this case.

### B. Notice and Opportunity to be Heard

Here, the Estate moved, by notice of motion, for sanctions against SNC, Powell Goldstein, Rawls, Greene, and Rooney pursuant to Rule 11, 28 U.S.C. § 1927, and the Court's inherent powers. The Estate's motion papers set forth the conduct it believed to be

---

8. Rawls's supplemental affidavit reports that Powell Goldstein spent a total of $2,133,736 worth of time on the arbitration and the two suits, that Powell Goldstein was paid $300,693 in total disbursements, and that SNC paid costs and disbursements directly (*i.e.*, not through the firm) of $192,600, for a total in time and expenses of $2,627,029. Rawls also estimates that some 52% of the total time was spent on this case. Hence, assuming 52% of the disbursements also are attributable to this case, Powell Goldstein expended some $1,366,055 in time and expenses on this case. Rooney reports in his supplemental declaration that he expended $1,145,332 in time and was reimbursed $82,791 in expenses in connection with this case. He also clarified that in December 1991 he agreed to a partial contingency arrangement and that beginning in June 1994

he agreed to a full contingency. The total for Powell Goldstein and Rooney in time and expenses for this case is therefore $2,594,178. This information is substantially at odds with the explanation provided by Rawls at trial when he tried to allay my concern over what I perceived to be a grossly excessive expenditure of resources for a $63,941 case. (*See* Trial Tr. at 987–91). In addition, Powell Goldstein was actually paid, for the arbitration as well as both cases, $1,150,055 in fees and $300,693 in disbursements and Rooney was actually paid $742,010 in fees and $82,791 in expenses. It appears that SNC actually paid a total, in legal fees and disbursements, of $2,468,149, of which $1.5 million was reimbursed by the Estate as a result of the arbitration award.

sanctionable and discussed the applicable standards. Even before the Estate filed its motion papers, I issued an order on November 11, 1997 apprising the parties of certain concerns that I had in this respect.

SNC and its attorneys submitted opposition papers, including a memorandum of law and detailed affidavits with supporting exhibits. Each of the individual attorneys from whom sanctions are being sought submitted an affidavit explaining his view that an award of sanctions was not warranted. Hence, SNC and its attorneys have been provided with specific notice as well as an opportunity to be heard.[9]

## C. *The Sanctions Machinery*

The Estate moved for sanctions pursuant to Rule 11, section 1927, and the Court's inherent power. I examine each of these bases for sanctions in turn.

### 1. *Rule 11*

■ Rule 11 requires an attorney to sign every pleading or other paper filed with the court. The signature "certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive." *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 542, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *accord W.K. Webster & Co. v. American President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir.1994).

An attorney violates Rule 11 when he or she signs a pleading that contains a claim that is objectively unreasonable, even when the attorney did not act in bad faith. *MacDraw*, 73 F.3d at 1257–58. Rule 11 may also be the basis for imposing sanctions on a party in certain circumstances. *Id.*

■ Rule 11 was amended effective December 1, 1993, during the pendency of this case. The most significant amendment, for purposes of this present motion, was the addition of a 21–day "safe harbor" provision, which gives a party an opportunity to avoid sanctions by withdrawing the purportedly offending pleading or other filing within 21 days after the filing of a Rule 11 motion.[10] Here, the Estate did not move for sanctions until December 1997, after the appeal was decided, and well after Rule 11 was amended. SNC therefore had no opportunity, after the filing of the Rule 11 motion, to withdraw its fraud claim.

The Estate argues that it can nonetheless rely on the "old" Rule 11, as it contends that some of the offensive conduct occurred prior to the effective date of the amendment. *See Sussman v. Bank of Israel*, 56 F.3d 450, 456 (2d Cir.) (holding that "pre–1993 version of Rule 11" applied where conduct in question occurred in 1991), *cert. denied*, 516 U.S. 916, 116 S.Ct. 305, 133 L.Ed.2d 210 (1995). Indeed, the first three complaints were filed before December 1, 1993. The third amended complaint, however, was not filed until April 1994.

---

9. In submitting their supplemental affidavits in response to the Court's request for more information on attorneys' fees and expenses, SNC's attorneys asked for a hearing so that they could explain the "reasons underlying the time ... expended on the case." (Rooney Decl. ¶ 6). No hearing is necessary, in view of the numbers. I cannot conceive of any rational explanation for the expenditure of resources amounting to anything remotely close to $2.6 million for the fraud claim. To the extent that SNC and its attorneys are requesting a further hearing in general, one is not needed. I am intimately familiar with the facts, having presided over the case in its final pre-trial stages as well as at trial. In addition, SNC and its attorneys have had a full opportunity to be heard in writing.

10. Other amendments are potentially implicated as well. Under the pre–1993 Rule 11, for exam-

ple, a represented party who did not sign the pleading was subject to Rule 11 sanctions only upon a showing of subjective bad faith. *See MacDraw*, 73 F.3d at 1258. Under the amended Rule 11, monetary sanctions may be imposed on a represented party, with certain exceptions, apparently even without a showing of bad faith. *See* Fed.R.Civ.P. 11(c)(2)(A) & Advisory Comm. Notes to 1993 Amendments. Likewise, under the old Rule 11, sanctions could be imposed only on the attorney who signed the pleading, not the attorney's law firm. *See Pavelic & LeFlore v. Marvel Entertainment Group*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989). The amended Rule 11 provides that "[a]bsent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by the partners, associates, and employees." Fed.R.Civ.P. 11(c)(1)(A).

Even though some of the allegedly offending conduct occurred before December 1, 1993, SNC and its attorneys can still arguably rely on the safe-harbor provision. In *Knipe v. Skinner*, 19 F.3d 72 (2d Cir.1994), the Second Circuit addressed the issue of whether another amendment to Rule 11 could be applied retroactively for the benefit of a party against whom Rule 11 sanctions were being sought. Under the "old" Rule 11, the imposition of sanctions for a Rule 11 violation was mandatory. Under the amended Rule 11, however, the imposition of sanctions for a Rule 11 violation is discretionary. In *Knipe*, all the conduct occurred before Rule 11 was amended and the district court rendered its decision to impose sanctions before the amendment took effect. The amendment became effective during the pendency of the appeal. *See* 19 F.3d at 74, 75, 77. Nonetheless, the Second Circuit held:

> Because Rule 11 sanctions should be imposed with caution, ... we conclude that a just and practicable application of the amended Rule 11 requires that the district court be afforded an opportunity to exercise its discretion to impose sanctions under the amended version.

*Id.* at 78. Hence, the Second Circuit held that the amendment was applicable, even though the allegedly offending conduct occurred and the district court's decision was rendered prior to the effective date of the amendment.

Under the circumstances of this case, where the motion for sanctions was not made until December 1997, four years after Rule 11 was amended and more than seven years after the first complaint was signed and filed, and in view of my conclusions below with respect to the other available "sanctions machinery," I conclude that the Estate may not rely on Rule 11, either the old or the amended version. The significance of this ruling, of course, is that the Estate may not rely on the less onerous "objective unreasonableness" standard of Rule 11. Instead, it must prove bad faith.

### 2. *Section 1927*

■ Section 1927 provides:

> Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Section 1927 requires a showing of "subjective bad faith by counsel." *Lapidus*, 112 F.3d at 96; *accord Keller v. Mobil Corp.*, 55 F.3d 94, 99 (2d Cir.1995). Sanctions may be imposed under section 1927 against an attorney "when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Keller*, 55 F.3d at 99; *accord MacDraw*, 73 F.3d at 1261. Sanctions are not available under section 1927 against a client. *MacDraw*, 73 F.3d at 1262.

### 3. *The Court's Inherent Power*

The standards for imposing sanctions pursuant to this Court's inherent power are similar to the standards applicable to section 1927, with one major difference.

■ Although section 1927 applies only to attorneys, a court may assess attorneys' fees against both attorneys and parties pursuant to its inherent power for "act[ing] in bad faith, vexatiously, wantonly, or for oppressive reasons," *Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123, and for "misconduct during the course of litigation." *Milltex Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 37–38 (2d Cir.1995). As under section 1927, sanctions may not be awarded under a court's inherent powers unless the challenged actions are "entirely without color" and "motivated by 'improper purposes,' such as harassment or delay." *Id.* at 38 (citation omitted). A claim is "colorable ... when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980). In addition, a court ought not to rely on its inherent powers when it can impose sanctions under the Federal Rules or section 1927. "But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely

on its inherent power." *Chambers*, 501 U.S. at 50, 111 S.Ct. 2123.

## D. *The Imposition of Sanctions in this Case*

██ I now consider whether to impose sanctions on SNC and its attorneys pursuant to the Court's inherent power and on SNC's attorneys pursuant to section 1927. The analyses are the same, as two questions must be addressed: (1) whether SNC's position on the merits—that it reasonably relied on defendants' false representations that the Estate owned all the rights to all Warhol's works—was "colorable," and if not, (2) whether SNC and its attorneys acted in bad faith.

### 1. *Was SNC's Position Colorable?*

I am firmly convinced that SNC's fraud claim was frivolous and that its position with respect to reasonable reliance was not "colorable." The fact is that SNC and its attorneys knew that the Estate did not own all the rights to all of Warhol's works. Their own documents and testimony demonstrated this conclusively. SNC, with Powell Goldstein as counsel, chose to go forward with the transaction nonetheless, without conducting any investigation or due diligence. Therefore, it could not have reasonably relied on defendants' representations to the contrary, as SNC and its attorneys well knew when this case was filed.

I granted defendants' post-trial motion for judgment as a matter of law on this basis, holding that no reasonable jury could find that SNC reasonably relied on defendants' false representations that the Estate owned all the rights to all of Warhol's works. 927 F.Supp. at 652, 662–64. The Second Circuit affirmed on this precise point. 119 F.3d at 98–102.

In arguing that its fraud claim was colorable, SNC contends that it could rely on defendants' representations without investigating their truth, citing the following language from *Mallis v. Bankers Trust Co.*:

When matters are held to be peculiarly within the defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth.

615 F.2d 68, 80 (2d Cir.1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). (*See* Rawls Aff. ¶ 17; Pl. Mem. at 6).

██ The argument, however, is flawed in at least three respects. First, the argument ignores the following language from *Mallis*:

[Where plaintiff] has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations.

615 F.2d at 80–81 (*quoted in Schlaifer Nance*, 119 F.3d at 98). Plaintiff's counsel's statement that "[t]here were two possible readings of the law of New York" (Rawls Aff. ¶ 17) is simply incorrect. While there are two possible scenarios under New York law, there is only one "reading" of New York law. As explained clearly in *Mallis*, under New York law a plaintiff does not have a duty to investigate if the facts are peculiarly within the defendant's knowledge. If the facts are not peculiarly within the defendant's knowledge, however, and if, for example, the plaintiff has the "means of knowing" the truth, the plaintiff must investigate.

Second, here SNC and its attorneys had the "means of knowing the truth." The truth of whether the Estate did own all the rights to all Warhol's works was not a matter "peculiarly within [defendants'] knowledge." To the contrary, some of the information was already known to SNC and its lawyers and some was publicly available (for example, in the Feldman book). To the extent information was not known by SNC and its attorneys or was not publicly available, they could have asked defendants. SNC was entitled to have its lawyers conduct due diligence, but it chose not to do so. 927 F.Supp. at 664.

Third, not only did SNC and its lawyers have the means of knowing the truth, they in fact knew the truth. As their own documents and testimony demonstrated, SNC and its lawyers knew that there were numerous problems with the rights to Warhol's works. *See* 927 F.Supp. at 656–59, 662–64, 119 F.3d at 99–102. The Powell Goldstein

firm represented SNC in negotiating and drafting the Agreement and the Powell Goldstein lawyers knew that the Estate's representations were not accurate. Even assuming the Powell Goldstein litigators did not know initially what the Powell Goldstein corporate lawyers knew at the time the Agreement was negotiated, the litigators certainly knew the truth by April 1995, when the law firm's file was produced.

SNC also argues that its fraud claim was colorable because (i) the claim survived three motions to dismiss; (ii) I permitted the claim to go to the jury; and (iii) the jury found in its favor. Each of these arguments is rejected.

The fact that the fraud claim survived three motions to dismiss is irrelevant because the claim had no basis in fact. The three motions attacked only the sufficiency of the pleading, not the sufficiency of the evidence. The third motion was the only motion to challenge the claim of reliance, and it was based only on the language of the Agreement. As the Second Circuit has explained,

> At the disposition stage, the strength or weakness of a case may be viewed as a whole. That is not true when only a motion is before the court. Cases that are ultimately viewed as frivolous may well survive motions to dismiss under a system of notice pleading that does not require factual detail and even motions for summary judgment in which the evidence may be presented in a sketchy fashion and credibility may not be taken into account.

*Greenberg v. Hilton Int'l Co.*, 870 F.2d 926, 940 (2d Cir.1989); *cf. Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 606 (1st Cir. 1988) (affirming Rule 11 sanctions against party who survived summary judgment motion); *Rodriguez v. Banco Central*, 155 F.R.D. 403, 406 (D.P.R.1994) (that party "survives a motion for summary judgment" does not preclude imposition of sanctions).[11]

Likewise, the fact that I allowed the fraud claim to go to the jury is irrelevant. I did so reluctantly, particularly as to the punitive damages claim. As I made clear during the

trial, I believed there was little, if any, basis for a finding of fraud and particularly for an award of punitive damages. I submitted the claims to the jury largely because the Second Circuit has held that it is the better practice to let a claim go to the jury and then to set it aside, as that practice eliminates the need for a new trial in the event of a reversal. *See, e.g., Mattivi v. South African Marine Corp.*, 618 F.2d 163 (2d Cir.1980); *see generally* Charles A. Wright & Arthur R. Miller, 9A *Federal Practice & Procedure*, § 2533, at 319 (1995). I let the claim go to the jury knowing that there was a distinct possibility that I would grant a motion to set aside any verdict in favor of SNC. (*See* Trial Tr. at 675–77, 876–78, 962–1015).

Finally, the fact that the jury found in favor of SNC is testament, perhaps, to its attorneys' skills as trial lawyers and to little else. The point is that no reasonable person, no rational juror, could have found reasonable reliance. The fact that SNC persuaded this jury to find reasonable reliance proves nothing.

### 2. *Did SNC and its Attorneys Act in Bad Faith?*

I find that SNC and its attorneys, Powell Goldstein, Rawls, Greene, and Rooney acted in bad faith. I reach this conclusion for the following reasons:

First, SNC's position with respect to reasonable reliance was patently frivolous. For the reasons discussed above, I find that SNC's argument that it reasonably relied on defendants' false representations that the Estate owned all the rights to all Warhol's works to be "so completely without merit as to require the conclusion that [the prosecution of the fraud claim] must have been undertaken for some improper purpose." *Keller*, 55 F.3d at 99 (citations omitted).

Second, SNC's own documents, including the notes of lawyers at the Powell Goldstein firm itself, and the testimony of its own witnesses demonstrated that SNC and its attorneys *knew* there was no factual basis for

---

**11.** *But see* Fed.R.Civ.P. 11, Advisory Comm. Notes to 1993 Amendments ("[I]f a party has evidence with respect to a contention that would suffice to defeat a motion for summary judgment based thereon, it would have sufficient 'evidentiary support' for purposes of Rule 11.").

the claim of reasonable reliance. I cannot comprehend how the Powell Goldstein firm could have permitted SNC to prosecute this case and make the allegation that SNC reasonably relied on the Estate's representations when the Powell Goldstein lawyers who handled the corporate transaction believed the representations could not be true. Even assuming that the litigators, Rawls and Greene, did not become aware of these internal documents until April and May of 1995, when they were finally produced, at that point they had a duty to question whether there was a good faith basis for continuing with the lawsuit.[12] *See Kale v. Combined Ins. Co. of America*, 861 F.2d 746 (1st Cir. 1988) (attorney has duty, after filing pleading or other paper, to reassess client's claim throughout lawsuit); *Lane v. Sotheby Parke Bernet, Inc.*, 758 F.2d 71 (2d Cir.1985) (per curiam) (attorneys' fees may be assessed for period of time after frivolous nature of claim became apparent).

Third, notwithstanding the jury's verdict, I am firmly convinced that Roger Schlaifer lied. He testified at trial that, prior to signing the Agreement, he had "absolutely no knowledge that Warhol works were without copyright protection." (Trial Tr. at 425; *see also id.* at 320–21 ("[a]bsolutely no knowledge")). Not only did the record contain substantial evidence to show otherwise, this testimony also squarely contradicted Schlaifer's sworn testimony given at another trial in another case in April 1988, when he conceded that he noticed, prior to signing the Agreement, that a number of Warhol's works were *not* copyrighted. (*See id.* at 427–28). SNC's lawyers were or should have been aware of this testimony, and yet permitted Schlaifer to testify as he did.

Fourth, SNC's potential recovery of compensatory damages was only $63,941. Even giving SNC the benefit of all conceivable doubt (and I do not believe there is any reasonable doubt), its potential recovery in compensatory damages was only $281,441. Yet, SNC and its lawyers proceeded to run up $2.6 million in attorney time and disbursements pursuing the claim. Nor can SNC and its attorneys justify the expenditure of these kinds of resources on the basis that there was a possibility of recovering punitive damages, for the claim for punitive damages was even more frivolous than the underlying fraud claim, *see* 927 F.Supp. at 664–67, or on the basis that they could recover RICO damages, as the RICO claims had been dismissed in February 1994.

Fifth, SNC had already won in excess of $4 million from the arbitrators in June 1991. Not only had it therefore already been compensated for most of its damages, the Estate also had already been punished, as the arbitrators awarded $1.5 million in punitive damages. That SNC and its attorneys continued to prosecute the claim for pre-contract damages as hard as they did is strong evidence of vindictiveness and an intent to harass.

Sixth, by December 1991, SNC apparently started to lose interest in the case as it did not want to continue incurring substantial legal expenses. Yet, obviously emboldened by the arbitrators' award of some $1.46 million in attorneys' fees, the attorneys continued to press the case, under contingency fee arrangements. The attorneys obviously intended to make the same argument that they had successfully made to the arbitrators— that punitive damages should be based in part on legal fees and expenses. Indeed, that motivation became apparent when they sought, unsuccessfully, to have the jury consider their legal fees as part of SNC's claim for punitive damages. In view of the comparatively minuscule amount of compensatory damages at stake, it would appear that this was a case driven by the desire of the attorneys to rack up legal fees against what they perceived to be deep-pocket defendants.

12. I do not consider the Estate's request for sanctions as one based on alleged discovery abuse. It is much too late to be seeking sanctions for discovery abuse *per se*. Even assuming there was no discovery abuse, however, and even assuming the documents were privileged and that SNC was under no obligation to produce them, they still existed, and they still demonstrated that SNC's position with respect to reasonable reliance was not colorable. Moreover, the documents should have been, but were not, listed in a privilege log. If they had been so listed, of course, defendants could have sought to compel their production at an earlier point in the litigation or they could have moved for summary judgment.

Seventh, SNC's attorneys litigated this case with an unreasonable tenacity that is hard to comprehend. They sought to turn a breach of contract case into a RICO and fraud case. They invested $2.6 million in time and expenses pursuing what they knew, at least as early as June 1991, was a $281,441 claim for compensatory damages at best. After taking Hughes's deposition for five (albeit partial) days, they wanted additional testimony from him. Defendants' lawyers provided a letter from Mr. Hughes's doctor stating that Mr. Hughes was extremely ill and therefore unable to testify. SNC's lawyers then deposed the doctor about Hughes's medical condition. After that deposition, SNC's lawyers wanted Hughes to answer additional written interrogatories. I denied the request. (*See* 5/17/95 Tr. at 45–49). SNC and its lawyers marked 800 exhibits for use at trial. (*See* 6/8/95 Tr. at 2–6). They subpoenaed two attorneys to be present at trial as witnesses for ten days each. (*See* Order dated June 2, 1995). They first tried to show a video of part of Hughes's deposition taken for use at the arbitration, purely because they thought he would come across to the jury as an evil person. (*See* Trial Tr. at 544–51, 680–83). When I denied that request, they asked if they could show the jury a photograph of Hughes, hoping to generate hostility against Hughes because of his mere physical appearance. (*See id.* at 682–83).

I conclude that Powell Goldstein, Rawls, Greene, and Rooney acted in bad faith. I reach that conclusion reluctantly, for Rawls, Rooney, and Greene conducted themselves, for the most part, in a professional manner.[13] The combination of factors discussed above, however, leads me to the firm conclusion that they acted, at minimum, for improper reasons and with reckless disregard for their obligations as attorneys. *See Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (district court may impose sanctions pursuant to its inherent power where conduct "constituted or was *tantamount* to bad faith") (emphasis added); *Oliveri v. Thompson,* 803 F.2d 1265,

1273 (2d Cir.1986) ("an award under § 1927 is proper when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose"), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

### E. *The Amount To Be Assessed*

In determining what amount to assess as sanctions, I consider the egregiousness of the conduct in question, the mitigating factors, and the purpose of sanctions.

Here, SNC and its attorneys certainly engaged in egregious conduct. They filed a claim that simply was not supportable as a factual matter. Although the filing of the claim probably would not have been a basis for sanctions in itself, there was much more than the mere filing of a meritless claim here. Rather, SNC and its attorneys litigated the case in a vindictive manner, expending time and effort far out of proportion to what was reasonable. They continued to litigate the case after they had achieved a substantial victory, after the Estate had been severely punished, after the additional discovery had made it crystal clear that the fraud claim was utterly meritless, and after it had become apparent that the fraud claim was not worth litigating economically even assuming it had any merit. In the process, SNC and its attorneys needlessly burdened defendants, who were required to expend more than $900,000 defending themselves just from September 1994 through December 1996, as well as the Court.

On the other hand, there are mitigating considerations. The original complaint did contain a meritorious breach of contract claim. As noted, defendants did not move for sanctions at any time in the five years that the case was pending before trial. SNC did prevail at the arbitration on its breach of contract claim and the fraud claim survived three motions to dismiss. Finally, defendants did make misrepresentations. The opinion letter signed by Treanor, Harvey &

---

**13.** There were some exceptions. One of SNC's attorneys, for example, on numerous occasions, even after admonitions from the Court, made comments or took actions in front of the jury that were inappropriate. (*See, e.g.,* Trial Tr. at 114–15, 133–34, 140, 150, 535–36, 544–46, 804–06, 812, 859, 863, 872–73).

Horgan, for example, was an outrage, as it contained several statements that Harvey knew were absolutely false.

At the same time, however, these mitigating factors do not provide an excuse. As discussed at length above, SNC could · not have reasonably relied on the misrepresentations; the opinion letter was not received by SNC until after the Agreement was signed. Moreover, the fact that the Estate may have made misrepresentations did not entitle SNC to prosecute a fraud claim if it did not rely on the misrepresentations, nor were SNC and its attorneys justified in continuing to press the fraud claim after April 1995 when the critical documents were produced. Nor, for the reasons noted above, does the fact the claim survived three pleadings motions stand for much. The delay in seeking sanctions may eliminate any basis for seeking sanctions prior to 1995, but after a trial date was set, defendants really did not have much of an opportunity to seek sanctions. In addition, at the May 17, 1995 hearing, after Powell Goldstein's file had been produced, counsel for defendants put SNC on notice of defendants' view that the fraud claim was meritless, as he commented on the record that the newly produced . documents would "blow [SNC's] case away." (5/17/95 Tr. at 41). Counsel also noted that defendants were not moving for summary judgment at that time because so much money had already been spent on the case. With trial just a month away, I would not have been receptive to a summary judgment motion, or a motion for sanctions, at that juncture in any event.

 Turning to the purpose of sanctions, it is firmly established that sanctions are not a fee-shifting mechanism. Parties who have been subjected to sanctionable conduct are not as a result automatically entitled to attorneys' fees. *See Chambers,* 501 U.S. at 52, 111 S.Ct. 2123; *Estate of Calloway v. Marvel Entertainment Group,* 9 F.3d 237, 241 (2d Cir.1993), *cert. denied,* 511 U.S. 1081, 114 S.Ct. 1829, 128 L.Ed.2d 459 (1994). Rather, sanctions are imposed "to maintain the integrity of the system of federal practice and procedure." *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 552, 111 S.Ct. 922, 112

L.Ed.2d 1140 (1991) (citation omitted). In addition, sanctions do not "shift the entire cost of litigation; they shift only the cost of a discrete event." *Id.* at 553, 111 S.Ct. 922. Courts therefore should exercise their discretion "to award only that portion of a defendant's attorney's fee thought reasonable to serve"· the purpose of sanctions. *Eastway Constr. Corp. v. City of New York,* 821 F.2d 121, 123 (2d Cir.), *cert. denied,* 484 U.S. 918,· 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

In view of the above, I will impose sanctions on SNC, Powell Goldstein, Rawls, Greene, and Rooney, jointly and severally, pursuant to my inherent authority and, in the case of the law firm and the attorneys, also section 1927. I do so for their conduct after March 1995, because they thereafter continued to press a frivolous claim, when they knew it was frivolous, when SNC had already won a significant victory and the Estate had already been punished, and when the resources SNC and its attorneys were pouring into the case were not even remotely justified by the potentially recoverable damages. There was no reason for SNC and its attorneys to press the fraud claim, and certainly not in the manner in which they did, and I find that they pursued the claim after March 1995 in bad faith.· *See Oliveri,* 803 F.2d at 1272 ("An inherent power award may be imposed . either for commencing or for *continuing* an action in bad faith, vexatiously, wantonly, or for oppressive reasons.") (emphasis added).

Considering the sums spent by SNC in this case and the fact that Powell Goldstein was paid a total of $1,150,055 in fees (including the arbitration) and Rooney a total of $742,010 in fees, any award of sanctions must be substantial if it is to have any impact. Moreover, the Estate was required to spend almost $900,000 in the period after March 1995 defending itself. In addition, any award of sanctions will be borne by two entities and three individuals. Accordingly, in view of these circumstances and all the other factors discussed above, I award sanctions in favor of the Estate against SNC, Powell Goldstein, Rawls, Greene, and Rooney, jointly and sev-

erally, in the amount of $400,000.[14]

## CONCLUSION

For the reasons set forth above, the Estate's motion for sanctions is granted and sanctions are imposed against SNC, Powell Goldstein, Rawls, Greene, and Rooney, jointly and severally, in the amount of $400,000, to be paid to the Estate.

SO ORDERED.

14. I find that the sanctionable conduct was a "coordinated effort" and that joint and several liability is appropriate. *See Estate of Calloway*, 9 F.3d at 239–40. Both the client and the attorneys are at fault. To the extent that SNC or any of the attorneys believe that sanctions should be apportioned individually, or to the extent that they believe their financial resources and ability to pay should be considered, *see id.* at 241, they may request such relief by way of a motion for reconsideration or modification, with appropriate supporting affidavits.